659 A.2d 563

**COMMONWEALTH of Pennsylvania**

v.

**John DIAZ, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 14, 1995.

Filed May 16, 1995.

240

242

George H. Newman, Philadelphia, for appellant.

Mary L. Porto, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

Before WIEAND, BECK and BROSKY, JJ.

BROSKY, Judge:

This is an appeal from the judgment of sentence entered following appellant's convictions for possession of a schedule I controlled substance, i.e., marijuana,[1] possession of a controlled substance with the intent to deliver[2] and criminal conspiracy.[3]

Appellant presents the following issues for our review: (1) whether the trial court erred in denying his motion to suppress where there was neither probable cause nor reasonable suspicion: (a) to justify the canine sniff-search and the subsequent search of the U–Haul box; and (b) to detain/arrest appellant; and (2) whether the trial court imposed an illegal sentence. For the reasons set forth below, we affirm the judgment of sentence.

1. 35 P.S. § 780–113(a)(16) (defining the crime of possession); 35 P.S. § 780–104(1)(iv) (classifying marijuana as a controlled substance).

2. 35 P.S. § 780–113(a)(30).

3. 18 Pa.C.S.A. § 903(a).

Before addressing these questions, it is necessary to recount the relevant facts of this case. On the morning of October 11, 1992, the narcotics unit of the Philadelphia police were notified by the Houston, Texas Police Department that two Hispanic males, identified as "Jose Soto" and "John Diaz," were traveling from Houston to Philadelphia via a Continental Airlines flight that was due to arrive at 2:40 p.m.[4] Houston further advised that the males were transporting two U–Haul boxes which were suspected to contain controlled substances.[5] Upon receipt of this information, the police proceeded to the Philadelphia airport.

Officer Kinsky and his trained narcotics dog, Rex, were dispatched to the baggage area and conducted a sniff of the U–Haul boxes and other pieces of luggage from the Houston flight when it arrived. Rex was observed to have a positive reaction to both boxes and this information was relayed to Sergeant Michael Perrone, who conducted a surveillance of the passengers disembarking from the Continental plane.

Sergeant Perrone observed the Hispanic male identified as "Soto" as he specifically matched the description of one of the Hispanic males provided by the Houston police.[6] With respect to the other male identified as "Diaz," Sergeant Perrone initially thought that appellant, John Diaz, fit the description. However, Sergeant Perrone thereafter observed a third Hispanic male, later identified as Joseph Toledo, Sr., who more closely matched the description of "Diaz." Accordingly, Sergeant Perrone primarily focused his attention on Soto and

4. "Soto" was identified as a Hispanic male in his late twenties who was approximately 5'10" in height and had a thin build. "Soto" was described as wearing a green Boston Celtics baseball cap and black pants and carried a brown bag. The individual identified as "Diaz" was described as a Hispanic male in his late forties, who was heavyset and approximately 5'8" in height. "Diaz" was described as wearing grey pants, a black shirt and a black coat.

5. The U–Haul boxes were marked with identification numbers and the names of the respective owners. Soto had Box no. 4539 and Diaz had Box no. 1929. The Houston police had their trained narcotics dog, Robie, conduct a canine sniff of the U–Haul boxes; Robie was observed to have given a positive response thereto.

6. This man was later identified as Carlo Soto.

"Diaz," *i.e.,* Toledo, Sr. and followed the men to the baggage claim area.

Upon their arrival in the baggage claim area, Soto walked into the U.S. Air baggage claim while Toledo, Sr. went to the Continental baggage claim. Meanwhile, other officers who were stationed outside of the airline terminal saw a fourth male, who was later identified as Joseph Toledo, Jr., park his vehicle in front of the building and enter the terminal. Toledo, Jr. went to the U.S. Air baggage claim and briefly spoke with Soto. Toledo, Jr. then proceeded to the Continental baggage claim and talked to Toledo, Sr. following which he exited the terminal and waited outside.

By this time, the luggage and the U–Haul boxes had been placed on the luggage carousel. Toledo, Sr. walked over to the carousel and stood near Diaz. Toledo, Sr. picked up one of the U–Haul boxes and gave it to Diaz. Toledo, Jr. then reentered the baggage claim and had a brief conversation with Diaz. After Diaz verified his claim of the box, he and Toledo, Jr. exited the terminal and proceeded towards Toledo, Jr.'s vehicle. Diaz and Toledo, Jr. were then stopped by the police officers stationed outside the building.[7]

While Toledo, Jr. and Diaz were being detained, Sergeant Perrone saw Soto leave the U.S. Air baggage area, enter the Continental baggage claim and stand near Toledo, Sr. Soto removed the second U–Haul box from the carousel while Toledo, Sr. picked up a maroon suitcase. After verifying their claim checks, the men exited the baggage area. Soto and Toledo, Sr. were then intercepted by Sergeant Perrone and other members of the narcotics team.

Sergeant Perrone apprised all of the men that he suspected them to be transporting controlled substances. As it was apparent that Soto did not understand/speak English, Sergeant Perrone had Officer Carrione translate in Spanish. The men and the U–Haul boxes were then transported in unmarked police vehicles to an airport police security room. The

---

7. When the officers approached and identified themselves, Toledo, Jr. attempted to run but lost his balance and fell. As a result, appellant and Toledo, Jr. were taken into custody.

police obtained Diaz's and Soto's written consent to search the boxes.[8] Upon conducting the search, the police discovered 36.2 pounds of marijuana in Diaz's box and 34.4 pounds of marijuana in Soto's box. As a result, all of the men were arrested and charged with various offenses arising out of this incident.[9]

Defendants Diaz, Soto and Toledo, Jr. all filed motions to suppress the physical evidence and their statements. A joint hearing on the motions was held in November of 1993. Following the hearing, the trial court granted Toledo, Jr.'s motion but denied Diaz's and Soto's motion.[10] Diaz and Soto waived their right to a jury trial. A bench trial was held in March, 1994 [11] following which the defendants were immediately sentenced.[12] Diaz subsequently initiated this timely appeal therefrom.[13]

**8.** Diaz's consent was in English. Soto's consent was written in Spanish except for a few terms describing the items to be searched and seized, which were written in English. Following the discovery of the marijuana, Diaz and Toledo, Jr. each gave written statements to the police in which they explained their role in the criminal enterprise. Soto declined to make a statement. Based on the information contained in Toledo, Jr.'s statement, the police obtained Toledo, Jr.'s and/or Toledo, Sr.'s consent to search a residence located at 2542/2544 North Mascher Street. Toledo, Jr. cooperated and participated in the search, which yielded additional quantities of marijuana and plastic bags. The propriety of the search of the Toledos' residence is not at issue in the instant appeal and will not be further discussed.

**9.** The charges against Toledo, Sr. were later dismissed.

**10.** The Commonwealth appealed the trial court's ruling with respect to defendant Toledo, Jr.; a panel of this court recently reversed this determination in an unpublished memorandum. *See Commonwealth v. Toledo, Jr.*, at docket no. 00174 Philadelphia 1994 (filed April 18, 1995).

**11.** The transcript of this proceeding is identified as having occurred on May 1, 1994. This date appears to be erroneous in light of other documents which suggest that the trial and sentencing occurred on March 1, 1994.

**12.** Diaz was sentenced to a period of four (4) to eight (8) years with respect to his convictions for possession/possession with the intent to deliver. A concurrent period of two and one-half (2½) to five years was further imposed for the conspiracy conviction.

**13.** Soto has likewise appealed; his conviction was affirmed in an unpublished memorandum. *See Commonwealth v. Soto*, at docket no. 00914 Philadelphia 1994.

Appellant initially challenges the trial court's denial of his suppression motion.[14]

> When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. We are bound by the facts as are found and may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Lewis,* 535 Pa. 501, 504, 636 A.2d 619, 621 (1994) (citation and quotation marks omitted). *Accord Commonwealth v. Peters,* 434 Pa.Super. 268, 270, 642 A.2d 1126, 1127 (*en banc*), *allocatur denied,* 538 Pa. 668, 649 A.2d 670 (1994); *Commonwealth v. Brown,* 426 Pa.Super. 601, 603, 627 A.2d 1217, 1217, *allocatur denied,* 535 Pa. 673, 636 A.2d 632 (1993). We will evaluate the decision of the suppression court and appellant's argument in accordance with these principles.

 Appellant first contends that the evidence should have been suppressed because the Philadelphia police lacked either probable cause or reasonable suspicion to conduct the canine sniff search as well as the subsequent search of the U–Haul box. With respect to this issue, our Supreme Court has recognized that the use of a trained canine to sniff for the presence of drugs constitutes a search under Article I, § 8 of the Pennsylvania Constitution.[15] *Commonwealth v. Martin,*

**14.** Appellant indicates that our scope and standard of review is plenary. Appellant's Brief at 2. Appellant's bald conclusory statement does not satisfy the requirement set forth in Pa.R.A.P., Rule 3518(a), 42 Pa. C.S.A. Moreover, the scope/statement of review suggested by appellant is not correct. However, we will disregard this defect as appellee has supplied us with the appropriate scope/standard and because it does not substantially impede our ability to engage in effective and meaningful review of appellant's claims. *See* Pa.R.A.P., Rule 105(a), 42 Pa. C.S.A. (permitting this court to disregard the requirements of the appellate procedural rules).

**15.** However, a canine sniff of luggage in a public place is not deemed to be a search within the meaning of the Fourth Amendment of the United States Constitution. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct.

534 Pa. 136, 141–142, 626 A.2d 556, 559 (1993) and *Commonwealth v. Johnston,* 515 Pa. 454, 464, 530 A.2d 74, 79 (1987). A warrantless canine sniff search may be deployed to test for the presence of narcotics in a place where: (1) the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and (2) the police are lawfully present in the place where the canine sniff is conducted. *Commonwealth v. Martin,* 534 Pa. at 141, 626 A.2d at 559; *Commonwealth v. Johnston,* 515 Pa. at 465–466, 530 A.2d at 79. Where a canine is used to conduct a sniff search of a person, however, a more stringent standard is applied. Thus, the police must have probable cause to believe that the search will produce contraband or evidence of a crime before a canine sniff of a person may be performed. *Commonwealth v. Martin,* 534 Pa. at 143, 626 A.2d at 560.

To properly apply these concepts here, we must first ascertain whether the canine sniff involved a search of the person or a place. Appellant argues that the instant search was analogous to the search of a person which was conducted in *Martin.* We disagree and find *Martin* to be factually distinguishable.

In *Martin,* the police observed the defendant engaging in suspicious activity in a restaurant in which a satchel was passed between the defendant and his companion. *Commonwealth v. Martin,* 534 Pa. at 138–140, 626 A.2d at 558. When the defendant and his companions left the restaurant and walked to their car, the police approached the men with their guns drawn and demanded to know what had occurred in the restaurant. *Id.,* 534 Pa. at 140, 626 A.2d at 558. The police then ordered the defendant to drop his satchel following which a trained narcotics dog sniffed it and signalled a positive response. *Id.* A majority of the Supreme Court viewed the sniff as involving a search of the person rather than a place or object because the defendant had carried the satchel up to the point where he had been compelled to place it on the ground

2637, 2645, 77 L.Ed.2d 110, 121 (1983); *Commonwealth v. Martin,* 534 Pa. 136, 142, 626 A.2d 556, 559 (1993) and *Commonwealth v. Johnston,* 515 Pa. 454, 461, 530 A.2d 74, 77 (1987).

248

by the police. *See id.,* 534 Pa. at 143, 145–146, 626 A.2d at 560, 561–562.

██ Unlike the defendant in *Martin,* appellant did not have actual physical custody of the U–Haul box up until the time of the search. Nor was appellant forced by the police to relinquish possession of the box so that the canine sniff could be conducted. Instead, appellant relinquished custody of the box, albeit temporarily, to the airline personnel for stowage on the plane. The box was still in the physical possession of the airline personnel at the time it was subjected to the sniff search. *See* Suppression Hearing Transcript (S.H.T.) 11/1/93 at 11, 12, 151 and 154–156 (indicating that boxes and other luggage had been removed from the plane by the airline personnel and transported to the area where it would be unloaded and placed on the conveyor belt leading to the luggage carousel; the boxes and luggage were subjected to the canine sniff before being placed on the conveyor belt). Appellant was completely unaware of the fact that the search was conducted, and therefore, the concerns regarding the invasion/intrusion of the suspect's person, which were at issue in *Martin,* simply are not present here. Under these circumstances, we conclude that the facts of this case are more closely aligned with those of *Commonwealth v. Johnston* rather than those in *Martin. Compare Commonwealth v. Johnston,* 515 Pa. at 457–458, 530 A.2d at 75 (where a locker at a rental space facility was subjected to a canine sniff with the permission of the rental facility authorities). Accordingly, the Philadelphia police only needed to articulate reasonable grounds that contraband was present in order to conduct the canine sniff. *Commonwealth v. Johnston, supra,* 515 Pa. 454, 530 A.2d 74. Having made this determination, we must proceed to ascertain whether the police satisfied the requirements of *Johnston.*

██ Sergeant Perrone testified that the Philadelphia police received information from the Houston, Texas police that two Hispanic males identified as "John Diaz" and "Jose Soto" were believed to be transporting controlled substances in two

U–Haul boxes.[16] S.H.T., 11/1/93 at 8–10, 20, 22; Exhibit D–1 (Police Investigation Report, Form 75–49).[17] The Philadelphia

**16.** The Houston police conducted a canine sniff search of the boxes and had observed a positive reaction by their own trained narcotics dog, Robie. S.H.T. 11/2/93 at 213–214; Exhibit D–1 (Police Investigation Report, Form 75–49). Appellant does not question the legality of the Houston canine sniff or its effect, if any, upon the validity of the subsequent canine sniff conducted in Philadelphia. We thus will not discuss these matters. We nonetheless note that while Texas recognizes that a canine sniff is not a search for Fourth Amendment purposes, the Texas courts have not yet decided whether a canine sniff constitutes a search under Article I, § 9 of the Texas Constitution. *See Crockett v. State*, 803 S.W.2d 308, 310 n. 5 (Tex.Crim.App.1991). However, the Texas Court of Appeals has held that Article I, § 9 of the Texas Constitution should be interpreted in a manner consistent with the Fourth Amendment of the United States Constitution. *See Aitch v. State*, 879 S.W.2d 167, 172 (Tex.Ct.App.1994) (review refused 11/16/94). It thus appears that Texas would not consider a canine sniff to be a search under the Texas Constitution.

**17.** The parties dispute whether Exhibit D–1 was admitted into evidence. With respect to this issue, the record discloses that D–1 was specifically utilized by both the prosecutor as well as by defense counsel for Toledo, Jr., Mr. Silverstein, during their respective interrogations of the witnesses and closing argument. *See* S.H.T. 11/1/93 at 39–41, 47, 49–50, 54–55, 103, 135–137, 145 (in which Mr. Silverstein utilized the report during his cross-examination of the police officers); *id.* at 72 and 211–214 (where the prosecutor referred to the exhibit on re-direct and in closing argument). Both the Commonwealth and Mr. Silverstein moved for the admission of the exhibits into evidence. S.H.T., 11/1/93 at 157; S.H.T. 11/2/93 at 173. None of the parties objected to the admission of any of the exhibits when they were moved into evidence or at any other time. However, the record is silent as to whether the exhibits were in fact deemed admitted since the trial court did not expressly state that the exhibits were admitted or excluded. The record further reveals that neither appellant nor Soto requested that the evidence be limited for purposes of admissibility, *i.e.,* they did not ask the trial court to only consider the exhibit for cross-examination/impeachment purposes or to only consider it with respect to co-defendant Toledo, Jr. We also note that the exhibit was included in the certified record submitted to this court.

Based on the above circumstances, we conclude that exhibit D–1 may be properly considered as admissible evidence. Although the trial court did not explicitly state on the record that the exhibits were admitted, none of the parties objected to the proposed admission. Moreover, we can discern no basis upon which the exhibit could have been properly excluded, as it appears to be relevant, competent and probative of the issues that were germane to the suppression hearing. *See Commonwealth v. Crews*, 536 Pa. 508, 523, 640 A.2d 395, 402 (1994) (the admissibility of evidence must start with a threshold inquiry as to its relevance and probative value); *Commonwealth v. Davis*, 381 Pa.Super.

police were also provided with specific descriptions of the men

483, 491, 554 A.2d 104, 108 (1989), *allocatur denied,* 524 Pa. 617, 571 A.2d 380 (1989) (the basic requisite for the admissibility of any evidence in a criminal case is that it be competent and relevant). Appellant has not referred us to any authority which requires an exhibit, which is moved into evidence and to which no objection is raised, to be deemed excluded unless the trial court specifically states otherwise on the record. Nor has our own research uncovered any such authority. Rather, the rule in this Commonwealth is that evidence which is introduced without objection is treated as though it were admissible and given its natural probative value. *See* L. Packel & A. Poulin, *Pennsylvania Evidence* § 103 at 7 (1987). *See also Commonwealth v. Boden,* 399 Pa. 298, 308, 159 A.2d 894, 899, *cert. denied,* 364 U.S. 846, 81 S.Ct. 89, 5 L.Ed.2d 70 (1960) (hearsay testimony was treated as having been properly admitted and was considered as fully and with the same probative value as direct evidence where no objection was made thereto by the defendant). We accordingly find that in light of the facts presented here, exhibit D–1 must be treated as admissible evidence and accorded its natural probative value.

Appellant further suggests that even if the exhibit is deemed admissible, it should not be utilized against him as it was introduced by another co-defendant only for purposes of impeachment and cross-examination. Appellant again fails to refer us to any authority which would support this position, nor has our own research uncovered such authority. We nonetheless are not persuaded that appellant's assessment is correct. The record reveals that while the suppression hearing was based on the individual suppression motions filed by each defendant, the defendants joined in each other's motions and all sought suppression of the evidence on the same grounds. S.H.T. 11/1/93 at 3–4 and 5; S.H.T. 11/2/93 at 170, 197–198 and 203–205. Review of the suppression hearing transcript thus demonstrates that all of the defendants presented a unified defense in attacking the validity of the searches. The Commonwealth similarly applied the evidence justifying the canine sniff to all of the defendants. Given the course of the events which led to the canine sniff and the manner in which the Commonwealth and the defense proceeded, we discern no logical or compelling reason for limiting the scope and purpose of the exhibit. Moreover, neither appellant nor Soto objected to the evidence. Nor did they at any time suggest that the suppression court could only consider the evidence for a limited purpose. If the defendants wanted the evidence to be limited in scope, then it was incumbent upon them to bring this matter to the trial judge's attention. Since they failed to do so, the objection has been waived. *See, e.g., Commonwealth v. Butts,* 495 Pa. 528, 534–535, 434 A.2d 1216, 1219 (1981); *Commonwealth v. Boden,* 399 Pa. at 308, 159 A.2d at 899–900; *Commonwealth v. Turner,* 390 Pa.Super. 216, 221–222, 568 A.2d 622, 624 (1989), *allocatur denied,* 527 Pa. 645, 593 A.2d 418 (1990). Even were we to assume, purely for the sake of argument, that the exhibit is not properly in evidence, the record contained sufficient reference to the nature of the information relayed by the Houston police to reasonably justify the canine sniff search by the Philadelphia police.

as well as a precise description of and identification numbers pertaining to the U–Haul boxes. S.H.T. 11/1/93 at 8–10 and 12; Exhibit D–1. Sergeant Perrone corroborated the information received from the Houston police as he observed the individuals matching the description disembark from the Continental flight. S.H.T. 11/1/93 at 12–14; Exhibit D–1. While Sergeant Perrone watched the suspects, other officers verified the information pertaining to the U–Haul boxes and relayed this information to Sergeant Perrone. S.H.T. 11/1/93 at 12; Exhibit D–1.

 The Philadelphia police were entitled to rely upon the advice and observations supplied by the Houston police, as such information is deemed to be reliable. *See Commonwealth v. Weidenmoyer,* 518 Pa. 2, 12–13 n. 6, 539 A.2d 1291, 1296 n. 6 (1988) (recognizing that the courts have consistently held that another law enforcement officer is a reliable source). This knowledge, coupled with their own observations and partial verification of the information supplied by Houston, provided the Philadelphia police with articulable reasonable grounds for believing that controlled substances were present in the U–Haul boxes. Moreover, the police were undoubtedly lawfully present in the airport luggage area, as they were there with the permission and assistance of the airport authorities. *See* S.H.T. 11/1/93 at 151 and 154–155. Because the requisite elements were met, we find that the canine sniff search was valid. *See Commonwealth v. Johnston,* 515 Pa. at 466–467, 530 A.2d at 80 (canine sniff search was justified where police were lawfully situated at the time of the search and the police articulated a reasonable suspicion that drugs might be located within the storage building).

Appellant next argues that the police lacked probable cause or reasonable suspicion to detain him.

To determine the lawfulness of the police conduct in the instant case, it is necessary to establish the nature of the contact which occurred between the police and appell[ant] . . . . Encounters between the public and the police that do not involve a formal arrest may be categorized as mere encounters, non-custodial detentions, and custodial

detentions. The term "mere encounter" refers to certain non-coercive interactions with the police that do not rise to the level of a seizure of the person under the [F]ourth [A]mendment....

On the other hand, both non-custodial detentions and custodial detentions are seizures of the person that trigger [F]ourth [A]mendment protection. A non-custodial detention or forcible stop occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. In order to justify a forcible stop under the [F]ourth [A]mendment, the police must point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably indicate that criminal activity may be afoot. Custodial detention is a more severe form of government intrusion in which the conditions or duration of the police detention approximate the level of restraint associated with a formal arrest. In order to justify [a] custodial detention, the police must have probable cause to believe that an offense has been or is being committed.

Generally, a seizure was thought to have occurred, for purposes of triggering constitutional protection, if the officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen.... [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.... Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of a formal arrest are: the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat, or use of force; and the methods of investigation used to confirm or dispel suspicions. The fact that the defendant was the focus of the investigation is also a

relevant factor in determining whether he was "in custo-dy[.]"...

*Commonwealth v. Peters,* 434 Pa.Super. at 273–276, 642 A.2d at 1128–1130 (citations, quotation marks and emphasis omit-ted). *Accord Commonwealth v. Lewis,* 535 Pa. at 508–509, 636 A.2d at 623. Application of these principles persuades us that the encounter between appellant and the Philadelphia police constituted a seizure.

■ The record reveals that appellant and Toledo, Jr. were approached by Officer Quirk and Officer Mock, who identified themselves as police officers and exhibited their badges. S.H.T. 11/1/93 at 129–130. In response, Toledo, Jr. attempted to run, but lost his balance and fell. *Id.* at 130. Appellant and Toledo, Jr. were then taken into custody. *Id.* at 19 and 130. While Officers Quirk and Mock intercepted Diaz and Toledo, Jr., Sergeant Perrone and Officer Jeitner proceeded to stop Soto and Toledo, Sr. *Id.* at 19. After escorting Soto and Toledo, Sr. outside, the groups converged and Sergeant Perrone identified himself and the reason for the detention. *Id.* at 19–21. Appellant and his companions, as well as the luggage and the U–Haul boxes, were then transported via unmarked police vehicles to a police security room at the airport. *Id.* at 21. Sergeant Perrone admitted that appellant and the other men were not free to leave at the time they were intercepted. *Id.* at 68. Under these circum-stances, it is clear that appellant was subjected to a seizure by the police. *See Commonwealth v. Lewis,* 535 Pa. at 505–506, 509, 636 A.2d at 621–622, 623 (seizure occurred where defen-dants were confronted by several non-uniformed police offi-cers, the men backed away from the officers until they were against the wall, and the officers began questioning the men; the nature of the confrontation demonstrated a show of au-thority which constituted a restraint of the defendants' liber-ty).

■ Having clarified the nature of the encounter, we must next determine whether the seizure was justified. To justify a non-custodial detention or forcible stop, the police

must point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably indicate that criminal activity may be afoot. *Commonwealth v. Lewis*, 535 Pa. at 509, 636 A.2d at 623; *Commonwealth v. Peters, supra*, 434 Pa.Super. 268, 642 A.2d 1126. To justify a custodial detention, however, the police must have probable cause to believe that an offense has been or is being committed. *Commonwealth v. Peters, supra*, 434 Pa.Super. 268, 642 A.2d 1126.

> [T]he standard for evaluating whether probable cause exists is the "totality of the circumstances" test.... The [benchmark] of a warrantless arrest is the existence of probable cause, namely, whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. It is only the probability, and not a prima facie showing, of criminal activity that is the standard of probable cause for a warrantless arrest. When we examine a particular situation to determine if probable cause exists, we consider all the factors and their total effect, and do not concentrate on each individual element. We also focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might. Finally, we must remember that in dealing with questions of probable cause, we are not dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent men act....

*Commonwealth v. Brown*, 426 Pa.Super. at 605–606, 627 A.2d at 1218–1219 (citations and quotation marks omitted).

As previously discussed, the Philadelphia narcotics unit was advised by the Houston police that two Hispanic males identified as Diaz and Soto were suspected of transporting controlled substances to Pennsylvania. S.H.T. 11/1/93 at 9, 20 and 22; Exhibit D–1. Houston further provided specific information regarding the mode of transportation, the descriptions of the individuals, the U–Haul boxes and the suspected

contents thereof, as well as the basis for their knowledge. S.H.T. 11/1/93 at 10 and 12; Exhibit D–1. Sergeant Perrone and the other members of his team partially confirmed this information by their own independent observations. S.H.T. 11/1/93 at 12–14. The Philadelphia police also verified the suspected criminal activity by having their own trained narcotics dog, Rex, sniff the U–Haul boxes. Rex exhibited a positive response and thus signalled that controlled substances were present in the boxes. *Id.* at 12, 151 and 156. Officer Kinsky, Rex's partner and handler, further testified that he had participated in hundreds of investigations with the dog over a six year period and that Rex "had never been wrong yet." *Id.* at 152–153.

In addition to the above observations, Sergeant Perrone saw appellant take possession of the U–Haul box bearing his name and identification/claim numbers from Toledo, Sr., one of the men who matched the description provided by the Houston police. *Id.* at 17. Appellant then exited the terminal accompanied by Toledo, Jr., who appeared to be acquainted with the suspects, Toledo, Sr. and Soto. *Id.* at 15–16 and 17–18. When Officer Quirk and Officer Mock approached the men, Toledo, Jr. unsuccessfully attempted to flee. *Id.* at 130.

Viewing the totality of the above circumstances through the eyes of the trained officer, we conclude that the Philadelphia police officers had probable cause to believe that appellant and his confederates unlawfully possessed controlled substances.[18] *See, e.g., Commonwealth v. Johnston,* 515 Pa. at 468–470, 530 A.2d at 81–82 (police had probable cause to obtain a warrant

18. Appellant refers to *Commonwealth v. Lewis, supra,* 535 Pa. 501, 636 A.2d 619 in support of his claim that probable cause/reasonable suspicion was lacking because the police utilized a drug courier profile. Notwithstanding appellant's assessment and the trial court's statements to the contrary, the instant case simply does not involve the use of a drug courier profile, as occurred in *Lewis,* as justification for the detention. Unlike the facts in *Lewis,* the police here were not merely looking for and stopping individuals who fit the drug courier profile. Instead, the Philadelphia police focused upon appellant and his companions based on the reliable and highly detailed information provided by the Houston police. Appellant was thus stopped because of the canine sniff and confirmation of the other information by the Philadelphia police and not because of any potential similarity to a drug courier profile.

to search a rental locker based on the officer's observations, a positive response to a canine sniff and the defendant's prior history of narcotics violations); *Commonwealth v. Brown*, 426 Pa.Super. at 606–607, 627 A.2d at 1219 (probable cause to arrest defendant existed where he was found in the company of a burglary suspect a short distance from the scene of the crime and both men appeared to have been running); *Commonwealth v. Frank*, 407 Pa.Super. 500, 507, 595 A.2d 1258, 1262 (1991) (flight, coupled with additional facts pointing to a suspect's guilt, established probable cause to arrest). Accordingly, appellant's seizure was justified regardless of whether it is characterized as a custodial detention or forcible stop. Because the canine sniff search and subsequent detention of appellant were lawful, the trial court did not err in refusing to suppress the evidence.

In his final allegation of error, appellant challenges the legality of his sentence. Specifically, appellant argues that his maximum sentence is illegal because it violates the provisions of 35 P.S. § 780–113(f)(2) and the holding in *Commonwealth v. Bell*, 537 Pa. 558, 645 A.2d 211 (1994), *cert. denied sub nom. Bell v. Pennsylvania*, —— U.S. ——, 115 S.Ct. 1106, 130 L.Ed.2d 1072 (1995) and *Litzenberger v. Pennsylvania*, —— U.S. ——, 115 S.Ct. 1403, 131 L.Ed.2d 290 (1995). We find appellant's claim to be without merit.

Appellant was sentenced pursuant to the mandatory penalties set forth in 18 Pa.C.S.A. § 7508 which provides, in pertinent part that:

Notwithstanding any other provisions of this or any other act to the contrary, the following provisions shall apply: (1) A person who is convicted of violating section 13(a) ... (30) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, [*codified at* 35 P.S. § 780–113(a)(30),] where the controlled substance is marijuana shall, upon conviction, be sentenced to a mandatory minimum term of imprisonment and a fine as set forth in this subsection: ... (ii) when the amount of marijuana involved is at least ten pounds, but less than 50 pounds ...; three years in prison and fine of $15,000 or

such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: four years in prison and a fine of $30,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity....

18 Pa.C.S.A. § 7508(a)(1)(ii) (footnote omitted).

 Appellant does not dispute the applicability of this provision or the imposition of the mandatory minimum sentence of four years in view of his prior drug-related convictions. Instead, appellant contends that his maximum sentence of eight years exceeds the maximum penalty prescribed in the Controlled Substance, Drug, Device and Cosmetic Act (CSDDCA), which provides that "[a]ny person who violates clause ... (30) of subsection (a) with respect to: ... (2) [a]ny other controlled substance ... classified in Schedule I ... is guilty of a felony and upon conviction thereof shall be sentenced to imprisonment not exceeding five years, or to pay a fine not exceeding fifteen thousand dollars ($15,000), or both." 35 P.S. § 780–113(f)(2). As correctly recognized by appellant, our Supreme Court has held that while the fine provisions of section 7508 prevail over those found in section 113(f)(2), the statutes nonetheless can be consistently applied in regards to the minimum and maximum terms of incarceration. *Commonwealth v. Bell,* 537 Pa. at 569, 645 A.2d at 217. *See also Commonwealth v. Camperson,* 437 Pa.Super. 355, 370–372, 650 A.2d 65, 73 (1994) (following *Bell* ). Thus, the statutes can be respectively construed as providing for a mandatory minimum penalty of three years and a maximum penalty of five years where an individual is a first time offender and the amount of marijuana involved is at least ten but less than fifty pounds. *Commonwealth v. Bell, supra,* 537 Pa. 558, 645 A.2d 211; *Commonwealth v. Camperson,* 437 Pa.Super. at 371 n. 1, 650 A.2d at 73 n. 1.

 However, appellant's argument ignores the fact that he is not a first time offender. Due to his recidivist status, it is therefore the maximum penalty set forth in section 115 of

258

the CSDDCA, 35 P.S., rather than that contained in section 113(f)(2) which is controlling. Section 115(a) directs that "[a]ny person convicted of a second or subsequent offense under clause (30) of subsection (a) of section 13 of this act[, *i.e.*, 35 P.S. § 780–113(a)(30) ] . . . may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both." 35 P.S. § 780–115(a). Consequently, the maximum possible penalty applicable to appellant was a period of up to twice the five year term which was otherwise authorized, or ten years.

Utilizing the rationale applied in *Bell* and *Camperson*, section 7508 and section 115(a) can be construed together to provide for a four year minimum and ten year maximum period of incarceration. Appellant received a maximum sentence of eight years, a term which was well within the maximum applicable statutory limit. Appellant's sentence therefore was not unlawful. Because none of appellant's claims necessitates the grant of appellate relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.