685 A.2d 132

**COMMONWEALTH of Pennsylvania**

**v.**

**Durrell GRAHAM, Appellant.**

Superior Court of Pennsylvania.

Submitted June 10, 1996.

Filed Oct. 22, 1996.

170

Joseph P. Burt, Erie, for appellant.

Christian A. Trabold, Assistant District Attorney, Erie, for Commonwealth, appellee.

Before McEWEN, President Judge, and FORD ELLIOTT and OLSZEWSKI, JJ.

OLSZEWSKI, Judge.

Since the law in Pennsylvania is unsettled concerning the level of antecedent justification necessary to subject an arrestee's companion to a "pat-down" search, the opportunity to definitively address the issue in this case is welcomed.

■ On August 8, 1995, appellant Durrell Graham was convicted, after a non-jury trial, of possession and possession with intent to deliver 3.37 grams of crack cocaine. The Honorable Jess S. Juliante sentenced Graham to one to two years' imprisonment plus a $5,000 fine. Post-sentence motions were subsequently filed and denied, and this appeal follows wherein Graham claims that the trial court erred in failing to suppress the crack cocaine.[1] In support of his claim, Graham contends that the stop and frisk, which resulted in the recovery of the illicit drugs, was violative of his rights under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

■ On an appeal from a motion to suppress, we only review whether the record supports the trial court's factual findings and whether the trial court's legal conclusions drawn from the facts are in error. *Commonwealth v. Medley,* 531 Pa. 279, 282–84, 612 A.2d 430, 432 (1992). Instantly, the record supports the trial court's following findings:

[O]n July 18, 1994, at approximately 1:45 a.m., K–9 Officer Terry Dawley of the Erie Police Department was on routine patrol in the area of 23rd and German Streets with his dog[,] "Cujo." While on patrol, in this high crime, high drug-trafficking area[,] Officer Dawley noticed three (3) black males on the porch of the Gateway Day Care Center. Recognizing some of those individuals, he determined that there was an outstanding arrest warrant for one of the three, i.e, Mr. Ronnie Beason. He recognized the other individuals as [Graham] and Mr. Terry Jones.[ ] As he watched the three (3) men, they began walking in an easterly direction on East 23rd Street. At that time he

---

**1.** Graham also contends that the trial court improperly allowed an expert witness to testify as to whether Graham possessed his drugs with an intent to deliver. This argument is easily disposed of, however, as this Court has already stated that expert testimony concerning whether "the packaging, paraphernalia, and quantity of [seized] cocaine ... was consistent with distribution" is "clearly admissible." *Commonwealth v. Montavo,* 439 Pa.Super. 216, 225 n. 5, 653 A.2d 700, 705 n. 5, *alloc. denied,* 541 Pa. 636, 663 A.2d 689 (1995). *See Commonwealth v. Campbell,* 418 Pa.Super. 391, 402–04, 614 A.2d 692, 698 (1992), *alloc. denied,* 535 Pa. 630, 631 A.2d 1003 (1993).

yelled for them to stop in order to apprehend Mr. Beason. Upon catching up to the three, he told Mr. Beason that he had a warrant for him and directed him to lie down. As Officer Dawley was about to arrest Beason on the authority of the outstanding warrant, he looked at [Graham,] who was approximately three (3) feet from him. At the same time he noticed a bulge in [Graham's] front left pocket. Officer Dawley testified that[,] as this was occurring, he was concerned for his safety and the dangers involved in being in this particular area. It is also significant that at the time of this incident, Officer Dawley was alone.

In order to allay his concerns for safety, Officer Dawley patted [Graham] down and felt what he believed was money in the Defendant's front pocket. He asked [Graham] what was in his pocket and the defendant admitted that it was money. Officer Dawley then patted [Graham's] back pockets and, as he was doing so, shined a flashlight down to the pocket and noticed a Lifesaver Holes bottle which appeared to contain crack cocaine.

Opinion, 2/21/96 at 2–4 (citations omitted). Consequently, Officer Dawley seized the cocaine and arrested Graham.

 Was Officer Dawley justified in conducting a pat-down search upon Graham? This question is not so easily answered. Both the United States and Pennsylvania Constitutions protect citizens from "unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. Thus, a seizure of the person without probable cause normally renders all evidence obtained as a result of the illegality inadmissible at trial. *Commonwealth v. Elliott*, 376 Pa.Super. 536, 544–45, 546 A.2d 654, 658 (1988), *alloc. denied*, 521 Pa. 617, 557 A.2d 721 (1989). Nevertheless, in limited circumstances, an individual may be stopped, briefly detained and frisked for investigatory purposes without probable cause. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969). In order for such a stop and frisk to be reasonable, however, the police conduct must meet two separate and distinct standards. *Commonwealth v. Robinson*, 410 Pa.Su-

per. 614, 618–620, 600 A.2d 957, 959 (1991), *alloc. denied,* 533 Pa. 599, 617 A.2d 1273 (1992); *Commonwealth v. Martinez,* 403 Pa.Super. 125, 588 A.2d 513 (1991), *alloc. denied,* 530 Pa. 653, 608 A.2d 29 (1992). First, in order for the stop to be appropriate, the officer must have reasonable suspicion, based upon specific and articulable facts, that criminal activity may be afoot. *Robinson, supra; Martinez, supra.* Second, in order to justify the frisk, the officer must reasonably believe that the suspect is armed and dangerous. *Robinson, supra; Martinez, supra.*

Despite these standards, there is authority in Pennsylvania to find that law enforcement officers are *per se* authorized to conduct a pat-down search upon an arrestee's companions. In *Commonwealth v. Chamberlain,* 332 Pa.Super. 108, 480 A.2d 1209 (1984), this Court quoted with approval the following language from *U.S. v. Berryhill,* 445 F.2d 1189 (9th Cir.1971):

We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a police officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from [the suspect's] associate because he cannot, on the spot, make a nice distinction between whether the other is a companion in crime or a social acquaintance. **All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer are constitutionally subjected to the cursory "pat-down" reasonably necessary to give assurance that they are unarmed.**

332 Pa.Super. at 114, 480 A.2d at 1212 (emphasis added).

While the Supreme Court of Pennsylvania has acknowledged *Berryhill's* "automatic companion rule," the Court noted that the rule has drawn a large amount of criticism. *Commonwealth v. Shiflet,* 543 Pa. 164, 174 n. 4, 670 A.2d 128, 133 n. 4 (1995) (citing 3 LaFave, Search and Seizure § 9.4a at 511, n. 71 (2d ed.1987); Notes, *The Automatic Companion Rule: An Appropriate Standard to Justify the Terry Frisk of an Arrestee's Companion?,* 56 Fordham L.Rev. 917 (1988);

Comment, *United States v. Bell, Rejecting Guilt by Association in Search and Seizure Cases,* 61 Notre Dame L.Rev. 258, 269 (1986); *United States v. Flett,* 806 F.2d 823 (8th Cir.1987); *United States v. Bell,* 762 F.2d 495 (6th Cir.1986)). After careful review, *Berryhill*'s critics must prevail in that the "automatic companion rule" is contrary to both the United States and Pennsylvania Constitutions.[2]

The "automatic companion rule" grants authority to the police to stop and search an individual based solely upon his choice of company without requiring reasonable suspicion that either criminal activity is afoot or that the individual is armed and dangerous. As such, it is not harmonious with the state or federal constitution. First, the Supreme Court of the United States of America has rejected the notion that a brightline test may be applied to warrantless search cases. *See Sibron v. New York,* 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917, 932 (1968) ("The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case."). *See also Terry,* 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910.

Secondly, and more specific to the subject of searching an arrestee's companion, the Supreme Court has stated that "a person's mere propensity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 86, 100 S.Ct. 338, 339, 62 L.Ed.2d 238, 245 (1979). *See also United States v. Di Re,* 332 U.S. 581, 587, 68 S.Ct. 222, 225, 92 L.Ed. 210, 216 (1948) (the Court was "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled."). Further, our State Supreme Court has concluded that:

2. While the Pennsylvania Supreme Court recognized the existence of the "automatic companion rule" in *Shiflet,* the Court declined to address whether the rule was constitutional. 543 Pa. at 174 n. 4, 670 A.2d at 133 n. 4. Furthermore, the *Chamberlain* Court, likewise, did not address this constitutional issue. As such, the issue is ripe for our consideration.

third parties (or their property) are generally not subject to searches merely because they are in the vicinity of an arrest unless there is probable cause or an articulable reasonable suspicion that the subject of the search is engaged in criminal activity or harbors a weapon.

*Shiflet, supra* at 170–72, 670 A.2d at 131. *See also Commonwealth v. Eichelberger,* 352 Pa.Super. 507, 508 A.2d 589 (1986), *alloc. denied,* 515 Pa. 619, 531 A.2d 427 (1987) (bystanders in location that is the subject of a lawful search warrant are not themselves subject to search absent probable cause or reasonable suspicion). In light of the above, a *per se* rule that a companion to an arrestee is subject to a "pat-down" search regardless of justification, effectively warrants "unreasonable searches" and is, thus, contrary to the Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution.

█ Having rejected the "automatic companion rule," the question next becomes what is the appropriate manner of review for cases involving the stop and frisk of an arrestee's companion. As noted above, a proper stop and frisk must usually meet two separate and distinct standards. *Robinson, supra* at 618–20, 600 A.2d at 959. *See Commonwealth v. Jackson,* 451 Pa.Super. 129, 678 A.2d 798 (1996). The officer must have reasonable suspicion, based upon specific and articulable facts, that 1) criminal activity may be afoot and 2) the suspect is armed and dangerous. *Robinson, supra.* Bystander cases are unique, however, and warrant special consideration under this bifurcated test.

█ It is well settled that to determine whether a search or seizure is reasonable, under the United States or Pennsylvania Constitution, "we must balance the societal interest in law enforcement and in protecting law enforcement officials against the individual's right to personal security free from arbitrary government interference." *Commonwealth v. Davidson,* 389 Pa.Super. 166, 170–71, 566 A.2d 897, 899 (1989), *alloc. denied,* 525 Pa. 624, 578 A.2d 412 (1990). *See United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574,

2578, 45 L.Ed.2d 607, 614–15 (1975); *Commonwealth v. Leninsky*, 360 Pa.Super. 49, 55–57, 519 A.2d 984, 988 (1986). Under the instant set of facts, the societal interest in safeguarding law enforcement officials is at a premium. Unquestionably, the officer's task of performing an arrest is inherently fraught with danger. Any other conclusion is belied by the fact that 23% of all law enforcement officers killed in the line of duty are killed while attempting arrests. *See Note: The Automatic Companion Rule: A Bright Line. Standard for the Terry Frisk of an Arrestee's Companion*, 62 Notre Dame L.Rev. 751, 758 (1987).

In light of the extreme risks facing lawmen in performing arrests, it will always be reasonable for officers to take some actions to insure their safety concerning companions of arrestees. To find otherwise, would be equivalent to turning a blind eye to reality and declaring open season on our protectors of the peace. Consequently, it is inherently reasonable for a law enforcement officer to briefly detain and direct the movement of an arrestee's companion, regardless of whether reasonable .suspicion exists that the companion is involved in criminal activity.[3] Such minimal intrusion upon the companion's federal and state constitutional rights are clearly outweighed by the need to extinguish the risks otherwise posed to the lawman's well-being. Accordingly, the first prong of the "stop and frisk" test is a nullity in cases involving an arrestee's companion.[4]

**3.** Clearly, this decision is not meant to allow the law enforcement officer to utilize the level of restraint associated with a formal arrest of the companion. The officer is merely warranted in effecting a protective detention of the person. As with investigatory detentions, the factors utilized in determining whether the detention became so coercive as to constitute the equivalent of a formal arrest include: the duration of the detention; the location; whether and how far the suspect was transferred against his will; whether restraints were used; and the show, threat, or use of force. *See Commonwealth v. Diaz*, 442 Pa.Super. 238, 252–54, 659 A.2d 563, 570, *alloc. denied*, 542 Pa. 658, 668 A.2d 1123 (1995).

**4.** This decision is not novel. In cases involving "stop and frisks" of persons located on premises in which a search warrant is being executed, our state and federal courts have not required that law enforcement officers possess reasonable suspicion that the suspect may

Frisking the companion, however, involves a much greater intrusion upon the person's constitutional rights than a mere detention. As stated in *Terry*, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." 392 U.S. at 25, 88 S.Ct. at 1882, 20 L.Ed.2d at 908. Further, the lawman's interest in safety is aptly protected by the ability to direct an unarmed companion to move to a location beyond physical reach. Thus, without additional justification, we cannot find that a "pat-down" search of the arrestee's companion serves to insure the safety of the officer to any greater extent than the officer's ability to briefly detain the companion and direct his/her movement. Accordingly, as with any "stop and frisk," the officer must have reasonable and articulable suspicion that the arrestee's companion is armed and dangerous before conducting a pat-down search. *See Davidson, supra.*

Thus, the question in the instant case becomes whether Officer Dawley's belief that Graham was armed and dangerous was reasonable. It was. The officer was alone and executing an arrest warrant at 1:45 a.m. in a high-crime and high drug-trafficking area. Further, and more importantly, Officer Dawley observed a bulge in Graham's pocket. In light of these circumstances, it was reasonable for Officer Dawley to conclude that Graham may have been armed and dangerous and, thus, the lawman was justified in frisking appellant. *See Commonwealth v. Fitzpatrick*, 446 Pa.Super. 87, 92, 666 A.2d 323, 326 (1995) (bulge in suspect's pocket allowed court to

be involved in criminality. The courts have focused merely upon whether the officers possessed a reasonable belief that the suspect was armed and dangerous. *See Ybarra, supra; Commonwealth v. Eichelberger, supra; Commonwealth v. Luddy*, 281 Pa.Super. 541, 422 A.2d 601 (1980). The United States Supreme Court has stated that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercised unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340, 349–50 (1981) (emphasis added) (footnote omitted).

conclude that "officers had a reasonable belief that their safety was in jeopardy."); *Commonwealth v. Patterson,* 405 Pa.Super. 17, 22, 591 A.2d 1075, 1078 (1991) ("The police may reasonably believe themselves to be in danger when the hour is late or the location is desolate.").[5]

As to the actual discovery and seizure of the crack cocaine on Graham's person, it was the result of nothing less than thorough police work. It is well settled that the " 'plain view' doctrine permits a warrantless seizure of private possessions by police." *Commonwealth v. Kendrick,* 340 Pa.Super. 563, 569, 490 A.2d 923, 926 (1985). The requirements for the "plain view" doctrine are: 1) the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position to view the evidence; 2) the officer must discover the incriminating evidence inadvertently; and 3) there must be probable cause to associate the observed property with criminal activity. *Id.* at 569–70, 490 A.2d at 927.

Instantly, having been authorized to conduct a "patdown" search of appellant, Officer Dawley was lawfully in a position to observe the exposed contents of Graham's back pocket. Further, there is no evidence that the lawman opened or even touched Graham's pocket when he used the flashlight to illuminate its contents. In fact, at Graham's suppression hearing, Officer Dawley testified as follows:

A. I continued to pat Durrell. I went around to the rear of him and patted his back pockets. In his right rear pocket I felt what I believed to be a Lifesavers Holes bottle.

Q. And at that point what did you do?

---

**5.** The dissent contends that the instant analysis of the automatic companion rule is unwarranted. This view, however, is short-sighted. Clearly, analysis of the automatic companion rule is necessary in determining the proper standard to be applied in the instant case. The dissent can necessarily overlook this point as it baldly concludes, without offering any analysis, that "[u]nder the facts of this case, I agree that the officer was justified in conducting a pat down." Dissenting Opinion at 1. Consequently, one is merely left to speculate as to how, in reaching its conclusion, the dissent would distinguish *Martinez, supra* (flight from street corner and bulge in jacket do not support a conclusion that criminal activity is afoot).

A. At that point I shined my flashlight down to his pocket, observed the Lifesavers Holes bottle with rocks of crack cocaine.

Q. Were you able to see the rocks of crack cocaine.

A. Yes.

N.T., 6/26/95 at 8.[6]

While Officer Dawley would not have been warranted in opening or reaching into Graham's pocket to expose its contents, he was clearly justified in using his flashlight to illuminate its already exposed cargo. *Commonwealth v. Merkt*, 411 Pa.Super. 127, 131, 600 A.2d 1297, 1299 (1992) ("the use of flashlights during the observation does not negate plain visibility."); *Commonwealth v. Bentley*, 276 Pa.Super. 41, 48, 419 A.2d 85, 88 (1980) ("The fact that [officer] required illumination from a flashlight to see into the darkened interior of the vehicle did not prevent the [evidence] from being in plain view or render the policeman's conduct unreasonable."); *Commonwealth v. Clelland*, 227 Pa.Super. 384, 387, 323 A.2d 60, 61 (1974) ("Since it was dark, the [officer's] use of an artificial light to look into the vehicle was justified."). *See Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346 (1985) (officers were justified in seizing stolen items which they had viewed through car window with the aid of a flashlight); *Commonwealth v. Burton*, 292 Pa.Super. 73, 436 A.2d 1010 (1981) ("officer's discovery, albeit with the aid of a flashlight, of marijuana in plain view was not improper").[7] Further, there

6. The dissent places great emphasis upon whether the bottle was protruding out of Graham's pocket or entirely inside an open pocket. This distinction, however, is irrelevant. If the bottle was exposed above the pocket line, then there is no question that the plain view doctrine warranted its seizure. As explained below, however, the same holds true if the bottle was inside Graham's pocket which was open and, thus, exposing its contents to the outside world.

7. The dissent likens the instant matter to a police officer crouching down and shining his flashlight under the seat of a car. This analogy totally misses the point concerning the plain view doctrine. It is well settled that "[t]he only requirement for the plain view doctrine is that the officer must have had a right to be in the position to have the view." *E.g., Clelland*, 227 Pa.Super. at 387, 323 A.2d at 61. Instantly, the dissent agrees that Officer Dawley had a right to be in the position to view Graham's opened pocket, *i.e.*, while conducting the "pat down"

is no evidence that Officer Dawley frisked Graham for any reason other than to insure his own safety. As such, the discovery of the drugs must be deemed inadvertent. Finally, as the lawman could see the rocks of cocaine in the bottle, there was no question that he had probable cause to associate the observed property with criminal activity. Consequently, Officer Dawley's seizure of the drugs was proper and Graham's judgment of sentence must be affirmed.

Judgment of sentence affirmed.

McEWEN, President Judge, concurs in the result.

FORD ELLIOTT, J., files a dissenting opinion.

FORD ELLIOTT, Judge, dissenting.

I must respectfully dissent. While I might otherwise agree with the majority's analysis of the "automatic companion rule," I do not believe that it has anything to do with this case. Officer Dawley testified that his reason for the *Terry* frisk of appellant was his observance of a bulge in appellant's front pocket which caused him to fear for his safety. Under the facts of this case, I agree that the officer was justified in conducting a pat down. The automatic companion rule, which requires no articulable suspicion, was not relied upon by the Commonwealth and has not been raised as an issue in this case. I would defer the majority's determination that the automatic companion rule is contrary to both the United States and Pennsylvania Constitutions to another day when the issue is presented by the parties and fully briefed on appeal.

Nevertheless, I do not believe the record supports the facts as relied on by the majority to uphold the search of appellant.

search. Consequently, the dissent's analogy, in which the officer clearly does not have the right to be position to view evidence, is inapplicable. The more appropriate comparison is to where an officer utilizes a flashlight to peer into a darkened car and observes the contents of an opened glove compartment. In both the instant matter and the glove compartment scenario, where the officer has a right to be where he observes evidence, the mere additional element of using a flashlight for illumination cannot render the officer's conduct improper. *Id.*

While I agree with the majority that policeman Dawley could permissibly conduct a *Terry* frisk of appellant, I disagree with the majority's further conclusion that, "having been authorized to conduct a "pat-down" search of appellant, Officer Dawley was lawfully in a position to observe the exposed contents of Graham's back pocket." Majority opinion at 180. I can find no support in the record or in the findings made by the trial court that the Life Savers Holes container in appellant's back pocket was exposed or visible to the police officer. Rather, the record indicates that Officer Dawley first patted appellant's back pocket and felt what he believed to be a Life Savers Holes vial. Dawley then shined his flashlight down *into* appellant's pocket to confirm his suspicion.

The testimony quoted by the majority is entirely inconclusive on this point:

[OFFICER DAWLEY:] I continued to pat [appellant]. I went around to the rear of him and I patted his back pockets. In his right rear pocket I felt what I believed to be a Lifesavers Holes bottle.

[DISTRICT ATTORNEY:] And at that point what did you do?

[OFFICER DAWLEY:] At that point I shined my flashlight down to his pocket, observed the Lifesavers Holes bottle with rocks of crack cocaine.

[DISTRICT ATTORNEY:] Were you able to see the rocks of crack cocaine?

[OFFICER DAWLEY:] Yes.

Notes of testimony, 6/26/95 at 8. This simply does not support an inference that the container was exposed above the pocket's rim without requiring the officer to look into the pocket. However, just fourteen lines of testimony later, the district attorney asked another question that made the actual situation clear:

[DISTRICT ATTORNEY:] All right. When you looked *into* the pants pocket and you saw the vial and you also saw the crack cocaine, was there any question in your mind that that was crack cocaine?

[OFFICER DAWLEY:] No.

Notes of testimony, 6/26/95 at 9 (emphasis added). Officer Dawley made no effort to correct the district attorney to the effect that the vial was visible outside of the pocket. Rather, it seems obvious that the officer agreed with the district attorney's characterization of events.

Furthermore, the Commonwealth continued to maintain this conceptualization of the situation in its closing argument:

[DISTRICT ATTORNEY:] As he [Officer Dawley] moves on and as he asked Mr. Graham [appellant] the first question, do you have any—or is that money in your pants pocket, he simply is confirming the fact that there is no weapon there, and he continues the pat down avoiding that area, obviously, the pants pocket. He already knows what's in there. Then he touches the back pocket and he feels something, and then he tells the Court honestly that it felt like a crack vial or felt like a Lifesavers Holes vial. He didn't come in here and tell you, 'Hey, I thought that was a gun so I pulled it out.' What he told you was what he honestly believed took place.

And when he does that, he doesn't pull it out, he doesn't conduct a search, he doesn't go to the next level with Mr. Graham, he stops right there and then he simply flashes his flashlight into the pocket. At that point in time, again, there is no search because he's able to see the drugs in plain view, and that doctrine establishes the right for this officer then to place Mr. Graham under arrest. And once he places Mr. Graham under arrest, then he can conduct the search incident to arrest. That's why everything that Officer Dawley did here was absolutely proper, and that's why we're suggesting to the Court that there should be no suppression of this evidence.

Notes of testimony, 6/26/95 at 15–16.

The Commonwealth repeats this characterization in its brief on appeal. *See* Commonwealth brief at 5. In its argument on

appeal, the Commonwealth also recites the plain feel doctrine and contends that some conjunction of that doctrine together with the plain view doctrine justifies Officer Dawley's conduct vis-a-vis appellant.

Similarly, the trial court's recitation of the plain feel doctrine in its opinion, pursuant to Pa. R.A.P.1925, 42 Pa.C.S.A., also signals the trial court's agreement with this characterization of the facts. Thus, if in ruling that the contraband was in plain view, the majority means to characterize the facts such that the Life Savers Holes container protruded above the pocket of appellant, such a characterization is belied by the record. *Cf. Commonwealth v. Allen,* 452 Pa.Super. 200, 681 A.2d 778 (1996) (Plain view doctrine justified seizure of cocaine filled baggie seen by police officer inside flared opening of suspect's sweatshirt. However, unlike the instant case, no affirmative actions were taken by police to bring the contraband into their view. Here, by contrast, Officer Dawley first felt the object in question and then shone his flashlight and trained his vision *down into* appellant's pocket.).

Officer Dawley was not justified in shining his flashlight down into appellant's pocket to aid his viewing of the contents. We have previously ruled on many occasions that the use of a flashlight to illuminate that which is obscured by darkness but which otherwise would be in plain view does not defeat that doctrine. The majority recites *Commonwealth v. Burton,* 292 Pa.Super. 73, 436 A.2d 1010 (1981), as one example. *Burton* is, indeed, typical of this line of cases which commonly involve a police officer shining his flashlight into a vehicle and thereby illuminating weapons or drugs in plain view either on the seat, the floor, or protruding from under a seat. The police officer merely illuminates that which would have been in "plain view" during daylight hours. However, I perceive a difference instantly, which may be demonstrated by way of an automobile analogy.

Assuming the existence of reasonable suspicion that an automobile driver may be someone who is wanted for arrest, a

police officer would be justified in stopping the car and asking the operator to exit the vehicle. For his own safety, the officer could also justifiably shine his flashlight into the interior of the car. If the beam revealed weapons or drugs in plain view on the seat or the floor, the officer would be justified in seizing same and arresting the driver. However, I do not believe that the officer could justifiably crouch down and shine his flashlight under the seat of the car. If the flashlight illuminated weapons or drugs under the seat, this would amount to a search and could not constitute plain view detection. Similarly, in the instant case, had Officer Dawley's flashlight revealed that appellant was visibly clutching the Life Savers Holes container in his hand or that it was visibly protruding from his back pocket, I would have no reservation about invoking the plain view doctrine to justify its seizure. Where, however, the police officer must shine his flashlight down into the suspect's back pocket and only then is contraband revealed, then I must find that the situation has ripened into a full-scale search and is not a case of mere plain view. I see little difference between inspecting the contents of a suspect's rear pants pocket by inserting the beam of a flashlight than by inserting the police officer's hand.

If the seizure of the contraband cannot be justified on the basis of plain view, the question remains whether it is supported under the companion plain feel doctrine.[1] Officer Dawley testified that when he patted down appellant's back pocket, he felt what he believed to be a Life Savers Holes container. This is not an object that is immediately apparent as contraband. Furthermore, even if Officer Dawley had

**1.** The plain feel doctrine is an adjunct of the plain view doctrine and was first enunciated in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993):

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

*Minnesota v. Dickerson*, 508 U.S. at 375–76, 113 S.Ct. at 2136–37.

testified that his experience with drug law enforcement gave him the knowledge that such a container was commonly used to package drugs, that would still not be sufficient to justify any further search and seizure. In *Commonwealth v. Stackfield,* 438 Pa.Super. 88, 651 A.2d 558 (1994), a police officer testified that when he patted down the appellant he felt a plastic baggie which he knew from experience was commonly used to package drugs. The court ruled that the subsequent search and seizure under the plain feel doctrine was not justified because a plastic baggie itself is not immediately apparent as contraband and could just as likely have contained the remains of appellant's lunch instead of drugs. Similarly, the Life Saves Holes container at issue could just as likely have contained candy instead of drugs. Under *Stackfield,* the subsequent search of appellant cannot be justified by the plain feel doctrine.

In conclusion, if the majority is ruling that the drug evidence at issue was properly not suppressed because the Life Savers Holes container was exposed in plain view above the pocket line of appellant's rear pants pocket, then I believe it is a misstatement of the facts. On the other hand, if the majority is ruling that the container was not visible above the pocket line, but was exposed to Officer Dawley's plain view when he shone his flashlight down into appellant's pocket and that this "plain view" justified the subsequent seizure, I believe it is misstatement of the law. In either event, I respectfully dissent.