614 A.2d 692

**COMMONWEALTH of Pennsylvania**

v.

**Braden Kent CAMPBELL, Appellant.**

Superior Court of Pennsylvania.

Argued May 21, 1992.

Filed Aug. 21, 1992.

392

Susan M. Hill, Bloomsburg, for appellant.

George O. Wagner, Dist. Atty., Danville, for Com., appellee. (Submitted).

Before BECK, JOHNSON and HUDOCK, JJ.

BECK, Judge:

The instant appeal requires us to visit once again the dimensions of a "stop and frisk" conducted with less than

probable cause and to evaluate the circumstances under which such a procedure is constitutionally permissible.

Appellant Braden Campbell was arrested along with two companions, Richard DeMatteis and Larry Bonetti, and each was charged with various counts of drug and weapons offenses. Although the cases were not joined for trial, a consolidated omnibus pretrial hearing was held on August 15, 1989, at which appellant, DeMatteis and Bonetti sought to suppress physical evidence. The trial court denied the suppression motion. Subsequently, appellant was convicted of possession of a controlled substance with intent to deliver, possession of a controlled substance, possession of drug paraphernalia, and conspiracy. Following the denial of post-verdict motions, appellant was sentenced to four to eight years on the delivery charge and six to twelve months on the remaining counts to run concurrently with the greater sentence. On appeal appellant Campbell challenges the judgment of sentence on three grounds. First, he argues that the trial court erred in denying his motion to suppress evidence. He also asserts that it was error to admit the expert opinion of a state trooper regarding the use of narcotics. Finally, appellant challenges the sufficiency of the evidence on the charges of possession with intent to deliver and conspiracy. We have thoroughly reviewed the record of the suppression hearing and the trial. We have considered the arguments made by appellant in support of his claims. We affirm.

The facts from which the instant case arose are as follows. State Trooper Steven Barilar received a frantic phone call from Rose Blue at about 7:00 AM, March 20, 1989. Blue was the owner of a self-service gas station in Valley Township, Montour County. Blue was frightened and alarmed and explained to Trooper Barilar that three "scruffy-looking" men in a brown car had pulled into her station and had pumped $10 worth of gas. Instead of paying for the gas right away, however, the men sat in their car, talking amongst themselves and looking into the service station. After several minutes of this, Blue's dismay grew and therefore she called the state trooper barracks. Blue stayed on the line several minutes

with Trooper Barilar, expressing to him her fear that the men were either going to leave without paying for their gas or rob her. Blue described the three men as unkempt and dirty-looking and she provided Barilar with the license number of the car they were driving. Barilar could tell that Blue was "very frightened", so he told her that he was on his way, and passed the phone to another state trooper. Blue was instructed to keep talking to the second trooper while Barilar drove the short distance from the barracks to Blue's service station.

Meanwhile, as Blue was talking to the second trooper, one of the men in the brown car came over to Blue and paid the $10.00 for the gas he had pumped. Blue told this to the trooper on the phone. She also told him that the brown car then went straight across the street to another service station. The second station was a Citgo gas station and Blue could see the brown car parked there from her vantage point across the street. Moments later, Trooper Barilar arrived at Blue's station. Blue pointed out the brown car at the Citgo station to Barilar. Barilar also knew that the men had paid for the gas they had pumped at Blue's station.

However, "[i]t didn't make sense" to Barilar that "someone would go from one gas station where they got gas and then go to another gas station." Still fearing a possible robbery, Barilar drove across the street to the Citgo station and parked behind appellant's unoccupied brown car. At first, the only people Barilar saw were two men emerging from another vehicle at the far side of the station. The men, later identified as co-defendant Richard DeMatteis and another man named James Meredith, approached Barilar.

Meredith did the talking. He appeared "very agitated" and Barilar was left with the impression that Meredith "wanted [Barilar] away from there." The trooper inquired about the brown car and its occupants, who were not in sight, and Meredith said that they were customers of his and that the trooper didn't have to stay. Although Meredith told Barilar that he was the manager of the station, Barilar stated that in his mind, Meredith's manner of dress belied the contention. Meredith was wearing a leather jacket, leather boots and blue

jeans. Barilar testified that Meredith was "scurfy-looking" [sic] and "looked to [him] as one of those described as the three type individuals as Mrs. Blue stated". Further, Barilar noted that he had been to that service station before but did not recognize Meredith as one of its employees.

Despite Trooper Barilar's repeated request to Meredith to identify the driver of the brown car, Meredith declined. After the trooper made the request three or four times, co-defendant DeMatteis went inside the service station and came out with appellant, who identified himself as the driver of the car. As soon as appellant approached the trooper, Barilar could see that he was concealing something underneath the leather jacket he was wearing.

Barilar asked appellant to produce a driver's license and owner's card. Appellant complied and the documents indicated that although he was the driver, he was not the owner of the vehicle. Meanwhile, as appellant and the trooper talked, appellant "kept his hand over an object which was under his jacket". The trooper described the bulge as being right in the center front of the jacket and about the size of a loaf of bread. Barilar asked appellant what he had under the jacket and appellant stated that there was "nothing".

Immediately on the heels of appellant's patently false response, an audible burglar alarm went off. As soon as the trooper heard the bells start ringing he put his hand on his service revolver and reached with the other hand to feel whatever it was under appellant's jacket. The trooper felt something there, unzipped the jacket, and saw a black nylon bag under the jacket. Fearing that appellant was concealing a weapon in the bag and believing that a robbery was either in progress or had just occurred, Barilar unzipped the nylon bag. Inside was a towel and a bag containing a white powder, which was later determined to be cocaine. The package of cocaine fell to the ground and Trooper Barilar drew his gun.

At some point during this part of the incident, Meredith emerged from the service station and stated that he had accidentally tripped the alarm. Whether this happened before or after Trooper Barilar unzipped the black nylon under

appellant's jacket is unclear from the record. Barilar first stated that Meredith came out of the station after he had unzipped the bag. Later, the testimony was that Meredith's explanation came just before the bag was unzipped. The trial court made no finding of fact regarding Meredith's statement about the alarm, presumably because the timing of the remark was unclear from the testimony. Trooper Barilar indicated that, in any event, he did not know who Meredith was and his testimony implied that he would not have put stock in the attempted reassurance. Moreover, as the following discussion of the issue demonstrates, the timing of Meredith's remark is not dispositive of the propriety of Barilar's actions. Just after the package of cocaine fell from appellant's bag, the third co-defendant Larry Bonetti, came toward Trooper Barilar. Barilar ordered all the men to place their hands on the car's hood, radioed for assistance and conducted a pat-down search of DeMatteis, Campbell and Bonetti. The frisk of DeMatteis yielded a golf-ball sized rocklike object which was found to be cocaine and an elongated pipe type object in the same pocket. Bonetti was armed with a .357 Magnum weapon and also had a small amount of cocaine on him. The search of appellant revealed nothing more than had already been discovered in the zippered bag. In a subsequent search of the car, the police seized a number of lighters, butane lighter fuel, a stainless steel cup, a bowl, a torch, wire, several pill containers, pieces of scouring pad, and a small scale. Meredith was not searched nor was he detained.

Appellant, DeMatteis and Bonetti were arrested and advised of their rights against self-incrimination. Later the men made incriminating statements indicating their involvement in a drug deal. Specifically, appellant gave a statement to Trooper Gregory Hall in which he described how the three men drove to Montour County from the western part of the state, pooled their resources and purchased a $10,000.00 supply of cocaine from James Meredith at the Citgo station.

Appellant was tried separately and convicted of possession of cocaine with intent to deliver, possession of cocaine, possession of drug paraphernalia, and criminal conspiracy. On

appeal, appellant's principal challenge goes to the trial court's denial of the motion to suppress evidence. His argument is premised on the contention that at the time the cocaine was uncovered by Trooper Barilar, the officer had no constitutionally recognized justification to stop appellant or to frisk him. In light of the appropriate standards, we disagree.

■ In challenges to the rulings of a suppression court, our standard of review is well defined and narrow. We are limited to determining whether the factual findings of the lower court are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Rodgers,* 413 Pa.Super. 498, 517, 605 A.2d 1228, 1237 (1992).

> In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports the factual findings, we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Chiesa,* 329 Pa.Super. 401, 404, 478 A.2d 850, 851 (1984).

Stops, frisks and "pat-downs" on less than probable cause have long been recognized as constitutional. The classic formulation comes from the Supreme Court's first treatment of the issue in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the Court held that:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such

a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken. *Terry v. Ohio,* 392 U.S. at 30–31, 88 S.Ct. at 1884–1885, 20 L.Ed.2d at 911.

In the twenty-four years since *Terry* was decided, courts have sought to delineate the proper boundaries of police conduct undertaken on the basis of reasonable suspicion that criminal activity is afoot. Most recently, the Supreme Court has explained that: "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990).

Many of the problems which arise in analyzing the legitimacy of police conduct are traceable to the circumstances in which these encounters between police and citizens arise. Such incidents unfold quickly and in an environment which requires prompt action by police to avert potential danger to themselves and others. Courts struggle to strike a balance between the considerable peril which might result from hesitation on the part of the police and the unquestionable right of our citizens to go about their business free from harassment and undue government interference. *See Commonwealth v. Daniels,* 280 Pa.Super. 278, 284, 421 A.2d 721, 724–725 (1980). In striking this balance, we are repeatedly admonished to take into account "the totality of the circumstances—the whole picture." *See, e.g., United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). This court recently had occasion to emphasize just this point. When deciding whether reasonable suspicion of criminal activity was present, we stressed that "it is incumbent upon us to recognize and account for the fluid nature of events as they were perceived by the officers at the time." *Commonwealth v. Epps,* 415

Pa.Super. 231, 608 A.2d 1095, (1992). In *Epps,* we held that a broken vent window alone provided an experienced police officer with sufficient constitutional justification to stop a car. *Epps* underscored the often unique ability of experienced police officers to draw inferences and deductions which untrained persons might not be able to make. The officer's testimony in *Epps* was that his experience taught him that unlawful entry into automobiles was routinely gained by breaking the smaller, more discreet vent windows instead of the larger, more conspicuous ones. This experience informed the officer's actions, reasonably allowing him to suspect criminal activity and justifying the actions he took pursuant to those suspicions. This court refused to ignore the experience of the officers and the realities of the criminal world and noted further that no delay in investigation would have been forgiven, under the circumstances. It is with the same degree of realism that we approach the instant case.

■ Appellant invites us to discount entirely the rapid, suspicious and volatile nature of events as seen and understood by Trooper Barilar. A highly agitated and frightened gas station attendant called Barilar to report her suspicions about a group of men assembled in a car at her station. Reacting to her fright, Barilar got in his patrol car and quickly traveled the distance to the station in twelve minutes. Meanwhile, although the occupants had paid for their gas at the first station, they went across the street to another gas station, which struck Barilar as odd. Still nervous about the group Barilar followed them there. When he first saw Meredith and DeMatteis coming towards him, Barilar took them for two of the three occupants of the original car. Appellant argues that even at this stage, he and his companions were "seized" because the trooper had parked his car behind theirs. This argument is totally meritless. The car at the time was unoccupied and there was no evidence from which it was reasonable to infer that, had Barilar found everything to be in order, Barilar would have done anything except go on his way and allow appellant and his friends to do the same. When

Barilar first pulled into the station he had not seized appellant and his companions by parking behind their empty car.

Furthermore, we do not need to speculate about what was going through Trooper Barilar's mind and whether the deductions he drew were reasonable in light of evolving events. Barilar testified specifically and repeatedly at the hearing regarding the situation as he perceived it and the record supports the variety of facts which underlay his suspicions. Barilar stated that he did not recognize Meredith nor did he believe that he managed the station from the way Meredith was dressed. In fact, Barilar thought that Meredith and DeMatteis were two of the three suspicious individuals who had aroused the fears of Mrs. Blue. When Campbell emerged from the station, Barilar thought he had before him all three individuals seen by Blue.

Meanwhile, when appellant approached Barilar he was obviously hiding something under his jacket, although when questioned he stated that the bulge was "nothing." Barilar knew by the size of the bulge that he was not seeing a part of appellant's anatomy.[1] He also knew that it was not "nothing", as appellant maintained.[2] The situation turned still more urgent when the burglar alarm sounded. Barilar's immediate assessment of the situation given: 1) Blue's suspicions; 2) the men's appearance; 3) the fact that they traveled to a second gas station despite having just purchased gas; 4) Meredith's apparent interest in "getting rid" of the policeman; 5) appellant's concealment of something under his jacket; 6) the absence of any uniformed attendant or anyone who did not seem to be with this group; and finally 7) the sounding of burglar alarm, was that "a robbery had occurred and these people in front of [him] were the ones who did it. [He] was

1. Barilar explained that the bulge in the stomach area was not consistent with the rest of appellant's physique or his facial features.
2. Barilar stated that the size of the bulge was about that of a loaf of bread. When asked in cross-examination whether it could have been a loaf of bread, Barilar said that it was "a possibility". He added: "Well, if it was a loaf of bread, he would have said he had a loaf of bread under his jacket."

afraid that the owner was either gagged in the back or had been shot."

It was this situation based upon these coalescing factors which caused Barilar to thrust his hand against appellant's jacket, confirming what, of course, he already knew, i.e. that appellant had lied when he said "nothing" was under there. With the burglar alarm still sounding, alone with three men he, at the time, reasonably suspected of robbery, Trooper Barilar acted to protect himself. He unzipped appellant's jacket and revealed the black nylon bag concealed there. Seeing that the bag was large enough to hold a gun and unable to determine whether, in fact, the bag contained one, Trooper Barilar unzipped the bag. We hold that under the totality of the circumstances, Barilar's actions were lawful. Once the cocaine fell to the ground, probable cause existed for appellant's arrest and appellant does not contend otherwise. Appellant argues that Barilar had no reason to search the bag because it was clear that no burglary was in progress and because he could have ascertained the contents of the bag some other way. We reject appellant's attempt to have this court second-guess the officer's actions and reassess the situation through the remote and disinterested perspective of a cold transcript. Instead we endeavor to view the circumstances through the eyes of the officer in order to determine the reasonableness of his conduct, which is, after all, the "essence" of the constitutional command. *Commonwealth v. White*, 358 Pa.Super. 120, 127, 516 A.2d 1211, 1215 (1986) ("The essence of state and federal constitutional provisions as to search and seizure is reasonableness. ... A policeman who lacks the precise level of information necessary for probable cause is not required to simply shrug his shoulders and allow a crime to occur or a criminal to escape.").

Further, appellant bases his argument that "no burglary was in progress" on the statement supposedly made by Meredith before the bag was unzipped that he had accidentally tripped the alarm. He argues that Barilar had no justification to frisk appellant since Meredith's remark should have reassured him and dispelled his fears. However, Barilar's express

testimony was that he did not accept Meredith's explanation nor did he know who Meredith was. Under the circumstances confronting Barilar, this judgment was reasonable, and we hold that Barilar could act to protect himself and attempt to disarm the seeming burglars. The fact that the men were not actually engaged in a burglary but instead were transacting a narcotics deal is wholly irrelevant to the reasonableness of Barilar's conduct when he frisked appellant. Therefore we hold that the trial court did not err in admitting the cocaine retrieved from appellant's bag.

 Appellant's next argument on appeal is that the trial court erred in permitting another trooper, Howard Howal, to testify at trial that in his expert opinion the amount of cocaine found on appellant was not consistent with personal use. There is no merit to appellant's argument. At trial, Howal testified that he had been a narcotics investigator for over seven years. He had been involved in narcotics transactions and with confidential informants. He was familiar with the prices of drugs and with the manner of operation of the narcotics trade. Howal explained the typical use and "dosage" of cocaine. He testified further regarding the use to which the seized drug paraphernalia would be put by drug distributors and users. Howal explained that, in all his years of narcotics trade investigation, he had never seen a pound of cocaine for personal use because it is "an extremely large amount." This testimony was elicited on the heels of lengthy explanations of the manner in which cocaine was consumed and sold. Howal clearly acquired his expertise through experience and occupational exposure to the drug trade. *See Commonwealth v. Daniels, supra,* 280 Pa.Super. at 286, 421 A.2d at 726. Appellant argues that Howal failed to state his opinion that the drugs were not for personal use with the requisite degree of certainty. However, we note that Howal's conclusion was unequivocally based on his experience that he had "never" seen such a large amount of cocaine used for personal consumption. Given this statement, we conclude, as did the trial court, that the expert stated his opinion with the requisite degree of certainty. The gist of appellant's argu-

ment appears to be that the fact-finder should not have credited Howal's opinion that the cocaine was not for personal use because there was testimony controverting the Commonwealth's theory. However, this argument was properly presented to the jury which rejected it. Appellant's argument that Howal's opinion should have been excluded must fail.

Finally, appellant argues that the evidence was insufficient to sustain the conviction of possession with intent to deliver. The standard by which this claim must be judged is settled. We view the evidence in the light most favorable to the Commonwealth as verdict winner, and accept as true all evidence and all reasonable inferences therefrom, which, if believed, could properly support the verdict. *Commonwealth v. Hughes,* 521 Pa. 423, 427, 555 A.2d 1264, 1267 (1989). In order to uphold appellant's conviction for possession of cocaine with intent to deliver, the Commonwealth must come forward with proof that appellant possessed a controlled substance, and did so with intent to deliver it. *Commonwealth v. Cardona,* 316 Pa.Super. 381, 387, 463 A.2d 11, 15 (1983). The intent to deliver may be inferred from an examination of all the facts and circumstances surrounding the case. *Commonwealth v. Robinson,* 399 Pa.Super. 199, 204, 582 A.2d 14, 17 (1990).

In the instant case, appellant and his co-conspirators admittedly traveled half-way across the state of Pennsylvania, pooled their resources and purchased a pound of cocaine for $10,000.00. According to the testimony at trial, the same pound of cocaine has a street value of $40,000.00. As a result of many years in drug enforcement and having had the experience of hundreds of "buys", Trooper Howal explained that drugs for personal use were ordinarily dispensed in much smaller quantities, principally grams, eighth ounces or quarter ounces. Howal also testified to the typical use of cocaine. Also, as noted above, Howal stated that the amount of cocaine seized from appellant was "extremely large" and he had never seen such an amount purchased for purely personal consumption. Appellant argues, however, that little in the way of drug trafficking paraphernalia was seized from appellant's car. In

fact, he notes that most of the drug paraphernalia seized were items consistent with personal consumption.

Appellant's argument falters because there is no requirement, of course, that the Commonwealth exclude all possibilities consistent with innocence or that the expert be able to categorically rule out the possibility of possession for personal use. As appellant concedes, and as the trial court notes, the sheer quantity of the drugs in his possession support the inference of an intent to deliver. *See Commonwealth v. Brown*, 232 Pa.Super. 463, 335 A.2d 782 (1975); *Commonwealth v. Santiago*, 462 Pa. 216, 340 A.2d 440 (1975). The cases cited by appellant to refute this inference involved far smaller amounts of drugs and do not control. Moreover, the expert here testified that the drugs were, in his experience, retained for resale. In our view there was ample evidence from which the jury could conclude that appellant possessed the cocaine with intent to deliver.

Judgment of sentence affirmed.