**COMMONWEALTH of Pennsylvania**

v.

**Madeline VASQUEZ, Appellant.**

Superior Court of Pennsylvania.

Argued June 26, 1997.

Filed Oct. 28, 1997.

Reargument Denied Jan. 5, 1998.

Daniel Glammer, Asst. Public Defender, Norristown, for appellant.

Patricia E. Coonahan, Asst. Dist. Atty., Cheltenham, for Commonwealth, appellee.

Before McEWEN, President Judge, and POPOVICH and OLSZEWSKI, JJ.

McEWEN, President Judge:

Appellant, Madeline Vasquez, has taken this appeal from the judgment of sentence to serve a term of imprisonment of from three years to six years, imposed after she was found guilty, following a trial without a jury, of possession with intent to deliver a controlled substance, specifically, cocaine. Appellant was also sentenced to serve a term of probation of one year for the offense of possession of drug paraphernalia. We are obliged to vacate the judgment of sentence and remand.

The facts of the case have been aptly summarized by the trial court:

At approximately 11:05 a.m. on Tuesday, May 23, 1995, Agent Ronald Paret of the Pennsylvania Attorney General's Office, Bureau of Drug Control, was conducting a drug interdiction technique known as "working the buses," whereby a police officer boards a bus in a depot, approaches a passenger, and requests consent to search the passenger's luggage. Agent Paret was accompanied in this effort by Trooper David A. Hodges of the Pennsylvania State Police. Trooper Frye, with a K–9 Unit, remained outside the bus at all times and had no direct contact with the defendant. Agent Paret and Trooper Hodges were not in uniform, however, both were wearing windbreaker type jackets clearly designating that they were police officers and their affiliation. Agent Paret's jacket read "Pennsylvania Attorney General" and "Police." Trooper Hodges' jacket bore the distinctive Pennsylvania State Police shoulder patches. Both officers' service weapons were concealed.

At approximately 11:05 a.m. a Capitol Trailways bus arrived at the King of Prussia bus depot in Upper Merion Township, Montgomery County, Pennsylvania. In keeping with the drug interdiction technique involved here, Agent Paret and Trooper Hodges asked the bus driver for permission to examine the tickets of all passengers on board the bus and for permission to board the bus and speak to the remaining four (4) passengers. The officers first identified themselves and their purpose and asked each passenger, in a conversational tone, "May I ask you some questions?" When the defendant responded in the affirmative, Agent Paret followed with a series of questions: "Where did you board the bus?" "What is your destination?" "May I ask to see your trip ticket?" "What is the purpose of your trip?" "How long do you expect to remain at your destination?" "Do you have any luggage?" "Did you pack your own luggage?" "Are you carrying any drugs?" "Would you mind if I searched your luggage?"

The defendant, Madeline Vasquez, was the last of the four (4) passengers Agent Paret spoke to on the bus. While speaking to the defendant, Agent Paret was standing

to the rear of the defendant, to her right, in the aisle. Trooper Hodges stood in front of her, facing her, approximately two (2) seats away. Trooper Hodges was not blocking the aisle and the door of the bus remained open at all times.

The court credits the testimony of Agent Paret and Trooper Hodges that their demeanor at all times was polite and their tone was conversational. The defendant herself testified that Agent Paret was polite and never raised his voice and that the door of the bus was open. Defendant testified that Trooper Hodges was in the aisle, not in the seats as he testified, however, the court does not credit the testimony of the defendant in this respect. [The trial court found] that Agent Hodges was not positioned in the aisle and did not block the aisle in any way. Both Agent Paret and Trooper Hodges were very much aware of the need to maintain a noncoercive atmosphere so that the defendant would have no basis to conclude that she was being seized by the police.

The defendant agreed to answer Agent Paret's questions. She told him that she lived in The Bronx, New York, where she boarded the bus en route to York, Pennsylvania, to visit her aunt. Agent Paret then asked the defendant about a black Jansport backpack on the floor between her legs. Defendant acknowledged that the bag and its contents belonged to her. Agent Paret then asked, "Would you mind if I searched your bag?" The defendant replied, "Go ahead and look."

Agent Paret then opened the backpack and found a small brown paper bag inside a pair of folded blue jeans. The contents of the brown paper bag were readily visible to Agent Paret as it was too small to close completely. Agent Paret saw that the bag contained a digital scale and a clear ziplock bag containing two smaller clear plastic bags, each of which contained what clearly appeared to be cocaine and which, upon testing, was revealed to be 29.3 grams of cocaine.

Agent Paret testified with respect to the drug interdiction technique in question and explained that New York City is consid- ered a "source city" for illegal drugs and that drug couriers are known to frequently use bus travel as a means of bringing the drugs into Pennsylvania cities, such as York. He explained the factors which served to heighten suspicion and may prompt a request for consent to search baggage. These factors include a "quick" trip, i.e., a very short stay at the destination point and a prompt return to the "source" city, payment for the ticket in cash, and the frequency of such trips. ·

The defendant, Madeline Vasquez, testified at the suppression hearing. She is now twenty years old, having been born on May 29, 1976. She had an eleventh grade education and lives in The Bronx. She testified that she did not know she could refuse to answer Agent Paret's questions. She further testified that she gave her permission to search her Jansport backpack because she thought that the police dog "would have smelled the drugs anyway and, if I lied, it would have been worse for me." She said if she refused permission to search her bag, she felt that the police would have thought that she was resisting.

The defendant never requested that the police terminate the encounter.

Nothing in the conduct or the attitude of the police served to communicate to the defendant that she could not refuse to answer Agent Paret's questions or that she could not refuse to grant consent to search her backpack.

Appellant now contends that the trial court improperly denied her motion to suppress because (1) the police officer did not possess probable cause nor reasonable suspicion that a crime was being committed on the bus, (2) appellant was seized as the result of the entry of the bus by police officers, (3) the officers did not possess probable cause nor reasonable suspicion to justify the search of appellant, and (4) appellant did not voluntarily consent to the search of her belongings.

The principal issue presented by this case is whether the search and seizure of appellant during the "bus sweep" in question was permissible under Article I, § 8 of the Penn-

sylvania Constitution[1] and the Fourth Amendment to the United States Constitution.[2] As our Pennsylvania Supreme Court has recently reiterated, the protection against unreasonable searches and seizures afforded by the Pennsylvania Constitution is broader than that provided by the federal Constitution. *Commonwealth v. Jackson,* 548 Pa. 484, 698 A.2d 571 (1997), *citing Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991).

This Court has long emphasized that, in interpreting a provision of the Pennsylvania Constitution, we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions. *See Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983); *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989); *Commonwealth v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974); *Commonwealth v. Campana,* 452 Pa. 233, 304 A.2d 432, *vacated,* 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44, *on remand,* 455 Pa. 622, 314 A.2d 854, *cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

As Mr. Chief Justice Nix aptly stated in *Sell,* the federal constitution establishes certain minimum levels which are "equally applicable to the [analogous] state constitutional provision." *Id.* 504 Pa. at 63, 470 A.2d at 466, *quoting Commonwealth v. Platou,* 455 Pa. 258, 260 n. 2, 312 A.2d 29, 31 n. 2 (1973). However, each state has the power to provide broader standards, and go beyond the minimum floor which is established by the federal Constitution. *Sell,* 504 Pa. at 63, 470 A.2d at 467.

The United States Supreme Court has repeatedly affirmed that the states are not only free to, but also encouraged to engage in independent analysis in drawing meaning from their own state constitutions. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980) (Rehnquist, J.). Indeed, this is a positive expression of the jurisprudence which has existed in the United States since the founding of the nation. . . .

\* \* \* \*

Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they "are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees," *Commonwealth v. Tarbert,* 517 Pa. 277, 283, 535 A.2d 1035, 1038 (1987), *quoting,* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L.Rev. 489, 502 (1977), we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

*Commonwealth v. Edmunds, supra* at 388–90, 586 A.2d at 894–95 (footnote omitted). The *Edmunds* Court also explained that, from a historical perspective, the requirement of probable cause, which is specifically set forth in Article I, § 8, predates the federal Constitution and embodies a strong tradition within this Commonwealth:

The requirement of probable cause in this Commonwealth thus traces it origin to its original Constitution of 1776, drafted by the first convention of delegates chaired by Benjamin Franklin. *See White, supra,* at xxiii. The primary purpose of the warrant

---

1. Art. I, § 8 of the Pennsylvania Constitution provides in pertinent part:

   "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures. . . ."

2. The Fourth Amendment to the United States Constitution provides in pertinent part:

   "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

requirement was to abolish "general warrants," which had been used by the British to conduct sweeping searches of residences and businesses, based upon generalized suspicions. *See White, supra,* at 158; *Wakely v. Hart,* 6 Binn. 316 (1814). Therefore, at the time the Pennsylvania Constitution was drafted in 1776, the issue of searches and seizures unsupported by probable cause was of utmost concern to the constitutional draftsmen. *Id.*

Moreover, as this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries....

*Commonwealth v. Edmunds, supra* at 394, 586 A.2d at 897.

■ As we review the order which denied the motion to suppress, we are first required to determine whether the findings of fact of the suppression court are supported by the record, for we are bound by those findings of fact if there is present in the record a sound evidentiary basis for the findings. As we do so, we must consider the evidence presented by the prosecution, and only so much of the evidence presented by the accused as remains uncontradicted by the record as a whole. Once we determine that there is a sound evidentiary basis for the factual findings of the suppression court, we proceed to the second step of a study of the legitimacy of the inferences and legal conclusions drawn by the court from those findings of fact, for we may only reverse at this stage if there is an error of law. ·

When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are erroneous. *Commonwealth v. D'Amato,* 514 Pa.

471, 482, 526 A.2d 300 (1987). Moreover, even if the suppression court did err in its legal conclusions, the reviewing court may nevertheless affirm its decision where there are other legitimate grounds for admissibility of the challenged evidence. *Commonwealth v. Dancer,* 460 Pa. 95, 331 A.2d 435, 438 n. 5 (1975).

*Commonwealth v. O'Shea,* 523 Pa. 384, 395, 567 A.2d 1023, 1028 (1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990). *See also: Commonwealth v. Concepcion,* 441 Pa.Super. 539, 542–44, 657 A.2d 1298, 1300 (1995); *Commonwealth v. Dorsey,* 439 Pa.Super. 494, 498–500, 654 A.2d 1086, 1088 (1995); *Commonwealth v. Campbell,* 418 Pa.Super. 391, 396–99, 614 A.2d 692, 695–696 (1992), *allo. denied,* 535 Pa. 630, 631 A.2d 1003 (1993).

■ As we undertake consideration of the initial claim of appellant that the police violated her constitutional rights when they conducted an investigatory stop without reasonable and articulable suspicion, we are mindful of the following caveat:

Not every encounter between a citizen and the police is so intrusive as to trigger the protections provided by the Fourth Amendment to the United States Constitution. *See: Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Douglass,* 372 Pa.Super. 227, 238, 539 A.2d 412, 417 (1988).

*In the Interest of Jermaine,* 399 Pa.Super. 503, 508–09, 582 A.2d 1058, 1060 (1990), allo. *denied,* 530 Pa. 643, 607 A.2d 253 (1992).

■ This Court has previously differentiated between a "mere encounter", an "investigative detention", and a "custodial detention." A mere encounter "need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond." *See: Commonwealth v. Allen,* 452 Pa.Super. 200, 207, 681 A.2d 778, 782 (1996). An investigative detention "must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest." *Id.* A custodial detention or "an arrest ... must be supported by probable cause." *Id.* Preliminarily, we must deter-

mine whether appellant was subject to a mere encounter or an investigative detention. Additionally, the Pennsylvania Supreme Court has stated that in order to determine whether a particular encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter." *Commonwealth v. Lewis*, 535 Pa. 501, 509, 636 A.2d 619, 623 (1994), *citing Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, —— (1991).

"When an officer, by means of physical force or show of authority, has restrained the liberty of an individual, a 'seizure' has occurred. '[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *Commonwealth v. Lewis*, *supra* at 508, 636 A.2d at 623, *quoting Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). This Court in *Commonwealth v. Wright*, 448 Pa.Super. 621, 672 A.2d 826 (1996), observed

[A]ppellant was confronted by five Lycoming County officers, who were wearing jackets bearing the words "Lycoming County Drug Task Force," when he disembarked from the bus in Williamsport. He was approached directly by police officers and was told that he was suspected of possessing illegal narcotics. Under these circumstances, the combination of the threatening presence of several officers and the officers' indication that appellant was suspected of criminal activity, a reasonable person would believe that he was not free to leave.

*Commonwealth v. Wright*, *supra* at 628, 672 A.2d at 829.

The precious balance we must here achieve has been depicted by this Court as follows:

Judicial examination of a challenge to a police search requires the court to balance the competing needs of society. On the one hand, the need of every society, including our free society, to provide for enforcement of its laws and thereby enable the preservation of the common weal is intrinsic to the existence of any society. That need in our society is, of course, described in constitutional parlance as the "police power". On the other hand, the quite decisive restrictions upon the "police power" imposed by the founders and framers in the Bill of Rights bespeaks their keen awareness of the awesome nature of the "police power". The specific role of the courts then is to balance the right of society to implement its police power against the right of a citizen to be free of police intrusion. This challenging task requires the courts to balance those competing rights and then to discern: what is "reasonable"—a term which, with its kin "fairness" and "due process", defies definition, but demands determination.

*Commonwealth v. Martinson*, 368 Pa.Super. 130, 140–41, 533 A.2d 750, 755 (1987), *allo. denied*, 521 Pa. 526, 557 A.2d 340 (1989).

The officers in the instant case, after reviewing each of the tickets in the driver's possession, sought and received permission from the operator of the bus to board the bus and interview the passengers who were seated on the bus, waiting for the bus to leave the terminal. Appellant was in the bathroom when the officers first entered the bus. After appellant returned to her seat, she was confronted by a narcotics agent and a Pennsylvania State Trooper, wearing jackets identifying themselves as police officers, who approached her and asked if she would produce her ticket and answer a few questions. Agent Paret stood over her shoulder in the seats behind her and Trooper Hodges stood two rows in front of her in the seats. There was another trooper positioned just outside of the bus, accompanied by a K–9 dog. While appellant, who was the only passenger on the bus who was asked to consent to a search, was not told she was under suspicion, such a message was so implicit as to be explicit. Moreover, despite the fact the officers never blocked the aisle, appellant could not leave the bus since she was en route to York when confronted by the officers during a layover in King of Prussia. While the Commonwealth argues that the

interview and search of appellant was a mere encounter, appellant could not proceed upon her way until the officers alighted from the bus, a fact implicitly recognized by Trooper Paret who testified: "That's a scheduled stop there at that location. We try—the other concern is the time concern, so as not to delay passengers that have to make connections et cetera. So we try to go through this as rapidly as possible." [3] The Commonwealth bears the burden of establishing that the seizure was constitutionally permitted. *See, e.g., Commonwealth v. Blasioli*, 454 Pa.Super. 207, 214–16, 685 A.2d 151, 155 (1996), *allo. granted*, 548 Pa. 36, 693 A.2d 584 (1997)(solely on issue of admissibility of product rule); *Commonwealth v. Govens*, 429 Pa.Super. 464, 472–74, 632 A.2d 1316, 1320 (1993), *allo. denied*, 539 Pa. 675, 652 A.2d 1321 (1994). However, the uncontroverted evidence of record establishes that the officers had "seized" the bus, albeit with the permission of the bus driver, preventing the continuation of the scheduled trip until the officers indicated to the driver that they had completed their task and he was free to resume his trip. This Court has discussed this precise scenario, albeit in the context of a private passenger vehicle, and has concluded that "police may only detain a driver and request a search if there are reasonable and articulable grounds to suspect criminal activity or contraband." *Commonwealth v. Parker*, 422 Pa.Super. 393, 400–01, 619 A.2d 735, 738 (1993).[4]

Consent obtained from a defendant who has been detained in the absence of any reasonable suspicion will not support a search. This Court, in *Commonwealth v. Daniels, supra*, found that drugs seized during an "airport sweep" were inadmissible where the consent to search luggage was given after an illegal detention. *Common-*

*wealth v. Daniels, supra* at 278–80, 599 A.2d at 990. Similarly, in *Commonwealth v. Jackson, supra*, this Court held that "appellant's consent to the search of his bag and his person which followed the wrongful detention did not cure the illegality." *Id.* at 253, 630 A.2d at 1235. We, therefore, must conclude that the purported consent of appellant did not serve to justify the search of her luggage where the appellant was detained without any reasonable suspicion of criminal conduct.[5] Thus, the officers were required to have a reasonable suspicion of criminal activity to support their request for a search.

As we have previously noted, specific and articulable facts are necessary to create a reasonable suspicion:

" '[When] a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334, 344 (1993)(quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968)). "[F]or such a stop to be reasonable ..., the officer must point to specific and articulable facts 'which in conjunction with rational inferences deriving therefrom' warrant the initial stop." *Commonwealth v. Arch*, 439 Pa.Super. 606, 612, 654 A.2d 1141, 1143 (1995). We must examine the totality of the circumstances to determine whether a particularized and objective basis for suspecting an individual stopped of criminal activity exists. *Commonwealth v. Wilson*, 440 Pa.Super. 269, 275–76, 655 A.2d 557, 561 (1995), *appeal granted*, 543 Pa. 509, 673 A.2d 864 (1996). Although the reasonable suspicion neces-

---

**3.** Trooper Hodges testified that since there were only four passengers on the bus, he did not make his usual announcement that:

"I'm Trooper Hodges of the Pennsylvania State Police. We are on the bus for your safety. We are on the bus to find narcotics, guns, hand grenades, bazookas, rocket launchers, anything that you're not supposed to have."

**4.** While these cases involve drivers and passengers traveling in private passenger vehicles, the

Commonwealth has not suggested that citizens using public transportation enjoy diminished constitutional protections.

**5.** It is the absence of reasonable suspicion in this case which distinguishes it from *Commonwealth v. Means*, (No. 3796 Philadelphia 1996; filed ——, 1997), where the response of the defendant to the inquiry as to his destination created a reasonable suspicion of criminal activity.

sary to justify a *Terry* stop is less stringent than probable cause, the detaining officer must have more than a hunch as the basis for his stop. Mere presence near a high crime area or in the vicinity of a recently reported crime does not warrant a *Terry* stop. *Commonwealth v. Kearney*, 411 Pa.Super. 274, 278, 601 A.2d 346, 348 (1992).

*Commonwealth v. Allen, supra* at 209–10, 681 A.2d at 783.

As determined by the trial court, Agent Paret "explained the factors which served to heighten suspicion and may prompt a request for consent to search luggage. These factors included a 'quick' trip, i.e. a very short stay at the destination point and a prompt return to the 'source' city, payment for the ticket in cash, and the frequency of such trips." As the Pennsylvania Supreme Court noted in *Lewis*, the U.S. Supreme Court has analyzed this use of drug courier profiles in *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

> In *Sokolow*, the Drug Enforcement Administration (DEA) agents stopped Andrew Sokolow upon his arrival at the Honolulu International Airport and found 1,063 grams of cocaine after a search of his carry-on luggage. The DEA agents knew that (1) he had paid $2,100 for two airplane tickets from a roll of $20 bills that appeared to contain a total of $4,000; (2) he traveled under a name different from his telephone listing; (3) his original destination was Miami, a source city for illicit drugs; (4) his stay in Miami was for only 48 hours, even though a round-trip flight from Honolulu to Miami took 20 hours; (5) he appeared nervous during his trip; and (6) he did not check any luggage.

\* \* \* \*

The U.S. Supreme Court acknowledged that any one of those factors was not proof of illegal conduct by itself and was consistent with innocent travel, but concluded that the factors amounted to reasonable suspicion when taken together.

*Commonwealth v. Lewis, supra* at 510, 636 A.2d at 624.

The factual circumstances of the instant case do not rise to the required level of reasonable suspicion. The cash payment of $60.00 for the round-trip bus ticket and the length of the trip to York, "a few days", fall short of the suspicious behavior in *Sokolow*. Agent Paret himself admitted that the use of cash for the inexpensive ticket was not unusual. Appellant claimed to make these trips once a month. However, unlike *Sokolow*, where the defendant stayed in Miami for 48 hours after a 20–hour trip from Honolulu, the appellant's trip from New York to York and the length of stay were common. Moreover, appellant did not appear nervous to the officers.

> The danger inherent in defining reasonable suspicion in the context of a "drug courier profile" is that the police officers' suspicion is not aroused by personal observation of an individual whose behavior sets him apart from other travelers. The use of a drug courier profile encourages the police officer to direct his attention to any individual whose behavior·falls within an over-inclusive set of characteristics that include innocent actions. A drug courier profile should serve only as a starting point of, and not as a substitute for, independent observation of an individual's behavior.

*Commonwealth v. Lewis, supra* at 511, 636 A.2d at 624.

This Court has previously been critical of drug courier profiles as used in factually analogous "airport sweeps":

> The drug courier profile is not a "national profile." Profiles vary from city to city, airport to airport, and also depending on which law enforcement agency is using them. The profile is subject to racial abuse and gender stereotyping, where the fact that a person is an African american, Columbian, or Hispanic has appeared as a profile characteristic, as has the fact that the person was the only woman on an airplane carrying business travelers. *Commonwealth v. Lidge*, 399 Pa.Super. 360, 582 A.2d 383 (1990). A breakdown of profile traits listed in the reported decisions reveals that it encompasses such contradictory characteristics as deplaning first and deplaning last, paying with small bills

and paying with large bills. It also encompasses an extraordinary amount of innocent behavior such that the average airline traveler would be hard-pressed to not display at some time during a trip. Furthermore, it is not clear whether the display of one or two characteristics is sufficient to fit the profile, or whether if some characteristics carry greater weight than other characteristics such that the display of one of these weightier characteristics may trigger an airport stop. Note, The Drug Courier Profile and Airport Stops: Reasonable Intrusions or Suspicionless Seizures? 12 *Nova.L.Rev.* 273, 288–296.

*Commonwealth v. Daniels,* 410 Pa.Super. 275, 280 n. 1, 599 A.2d 988, 990 n. 1 (1991), *allo. denied,* 531 Pa. 645, 612 A.2d 983 (1992), *cert.* denied, 507 U.S. 950, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993). We have also noted that the ability of drug courier profiles to accurately predict criminal activity has not been conclusively established, *see Commonwealth v. Jackson,* 428 Pa.Super. 246, 250 n. 2, 630 A.2d 1231, 1233 n. 2 (1993), *allo. denied,* 537 Pa. 647, 644 A.2d 733 (1994), and, accordingly, have held that drug courier profiles alone cannot supply reasonable suspicion. *See: Commonwealth v. Jackson, supra* at 251–53, 630 A.2d at 1234; *Commonwealth v. Bennett,* 412 Pa.Super. 603, 619–20, 604 A.2d 276, 284 (1992).

Since the officers did not have reasonable suspicion to justify the investigative stop in the instant matter, the trial court should have granted the motion to suppress. We, therefore, are obliged to vacate the judgment of sentence and remand for a new trial.

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

OLSZEWSKI, J., files a dissenting opinion.

OLSZEWSKI, Judge, dissenting:

While the expression of the majority view provides a persuasive analysis and sound rationale, I am obliged to differ. Because I believe that Vasquez's encounter with the police did not constitute a "seizure" under the Fourth Amendment of the United State's Constitution, I must respectfully dissent.[1] There are three characterizations of police encounters with suspects:

> a mere encounter, an investigative detention, or a formal arrest.... A "mere encounter" (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or to respond.... An "investigative detention" must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest.... A "custodial detention" must be supported by probable cause; it is deemed to arise when the conditions and/or duration of an investigating detention became so coercive as to be the functional equivalent of arrest.... Formal arrest requires probable cause, and needs no further definition.

*Commonwealth v. Tindell,* 427 Pa.Super. 399, 404, 629 A.2d 161, 163 (1993) (citing *Commonwealth v. Douglass,* 372 Pa.Super. 227, 238–239, 539 A.2d 412, 417–418 (1988) (citations omitted)). Thus, all encounters between a citizen and police are not so intrusive as to trigger the protections provided by the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *In Interest of Jermaine,* 399 Pa.Super. 503, 507–509, 582 A.2d 1058, 1060 (1990), *alloc. denied,* 530 Pa. 643, 607 A.2d 253 (1992). A policeman is not prohibited under the Constitution from approaching a person on a public street or in a public place and questioning him. *U.S. v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Tindell,* 427 Pa.Super. at 403–405, 629 A.2d at 163.

Both an investigative detention and a custodial detention constitute seizures. A seizure of a person sufficient to trigger Fourth

---

1. Vasquez also purports to challenge her encounter under Article 1, Section 8 of Pennsylvania's Constitution. Her challenge under our State Constitution, however, is commingled with her challenge under the Federal Constitution. Moreover, in presenting her State Constitutional claim, she fails to clearly brief and analyze the four factors required by our Supreme Court in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). Accordingly, I would find her challenge pursuant to our State Constitution waived.

Amendment protections occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *In Interest of Jermaine,* 399 Pa.Super. at 508, 582 A.2d at 1060 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988)). The factors which the Court considers in determining whether an encounter with the police constitutes a seizure within the Fourth Amendment include "whether the officer makes a show of authority or exercises force, the officer's demeanor and manner of expression, the location, and the content of any interrogatories or statements are relevant to the determination." *Id.* (citing *Commonwealth v. Williams,* 298 Pa.Super. 466, 470, 444 A.2d 1278, 1279 (1982) and *Commonwealth v. Jones,* 474 Pa. 364, 371–372, 378 A.2d 835, 838–840 (1977)).

With these standards in mind, I conclude that appellant's encounter with police did not amount to a seizure within the Fourth Amendment, but rather constituted a "mere encounter" for which no level of suspicion was required. In reviewing the denial of a motion to suppress evidence, we must determine

> whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings, we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Medley,* 531 Pa. 279, 284, 612 A.2d 430, 432 (1992); *McElrath v. Commonwealth,* 405 Pa.Super. 431, 436–437, 592 A.2d 740, 742 (1991).

Instantly, the trial court's following factual findings are supported by the record: Appellant was approached on a public bus by Agent Paret and Trooper Hodges who introduced themselves and asked appellant if she would speak to them. There was no display of a weapon or other show of authority to intimate coercion. Agent Paret merely questioned appellant about where she had been, where her destination was, what the purpose of her trip was, and whether he could inspect her bus ticket. The lawmen's demeanor at all times was polite and their tone was conversational. The isle of the bus was never blocked by the lawmen, the bus door was always open and appellant was not physically constrained by the officers. Agent Paret then questioned appellant concerning a backpack on the floor between her legs. Appellant acknowledged that the bag belonged to her and the agent asked if he could search it. Appellant replied, "Go ahead and look."

Under the circumstances of this case, I would hold that appellant was not "seized" within the Fourth Amendment prior to consenting to a search of the bag, as her experience with the police constituted a "mere encounter." *In Interest of Jermaine, supra; Tindell, supra.* A reasonable person in appellant's situation would have felt free to leave because her liberty was never constrained by the police. Hence, the encounter did not rise to such a level which would trigger Fourth Amendment protections. *Id.*

Appellant's encounter with police is similar to the police encounters described in *In Interest of Jermaine* and *Tindell* in which we held that defendants were not entitled to Fourth Amendment protections because the police questioning did not rise to the level of a seizure. *Id.* In *In Interest of Jermaine,* an officer approached defendant in a public train station, identified himself as a narcotics officer, and asked to speak to defendant for a moment. Defendant's path was never blocked, nor did the officer brandish a weapon or make any other display of authority. The officer asked defendant, who was visibly nervous, about her point of departure, whether she had a ticket, and what her name was. The officer never spoke to her in a threatening manner. Then, the officer asked her for consent to search her bag to which she responded: "Yes." Upon opening the bag, the officer found cocaine. We held that defendant was not "seized" (before the search of the bag) within the Fourth Amendment because the totality of the circumstances indicated that a reasonable person would have

felt free to leave. *In Interest of Jermaine, supra.*

Under similar circumstances, in *Tindell*, after perceiving defendant, who fit a number of characteristics indicative of a drug courier, deplaning in an airport, two officers asked defendant if she would speak to them, and told her that she was not obligated to talk to them. Defendant answered the officers' questions and consented to a search of her person. After defendant unzipped her jeans, she produced a package and handed it to an officer. She indicated that the package contained cocaine and she was placed under arrest. We held that defendant only had a "mere encounter" with the police and was not "seized" because she was apprised of her right to refuse to answer questions and consent to the search, and "there was no evidence that the officers retained her identification documents, blocked her path to exit, threatened her, demanded that she do anything, or touched her." *Tindell*, 427 Pa.Super. at 405, 629 A.2d at 164. In short, these cases show that, as in the instant case, a person is not seized where his liberty has not been constrained by the police by a showing of authority or the assertion of physical force. *Id.*

Accordingly, the encounter in the instant case was not a "seizure" and constituted a "mere encounter" for which appellant's Fourth Amendment guarantees were not implicated. Based on the foregoing, the trial court properly refused to suppress the 29.3 grams of cocaine discovered in the bag that Vasquez voluntarily consented to have searched. Therefore, I would affirm the judgment of sentence.