J-S61001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NYGEL JACK | |
| Appellant | No. 761 WDA 2015 |

Appeal from the PCRA Order April 14, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0003132-2008

BEFORE:  PANELLA, J., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, J.                    **FILED SEPTEMBER 21, 2016**

Apppellant, Nygel Jack, appeals from the order dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA"). Jack raises multiple challenges to the PCRA court's conclusion that his trial and direct appellate counsel were not ineffective. After careful review, we affirm.

After a melee in a bar left two victims with gunshot wounds, police charged Jack with aggravated assault and prohibited possession of a firearm.

> [Jack] was arrested and … proceeded to a jury trial at which numerous witnesses testified. Specifically, Amanda Gould testified that, on September 7, 2007, at approximately 10:00 p.m., she went to her family-owned bar, Sallade's with her friends and family to celebrate the remission of her aunt's cancer. At Sallade's, [she] consumed two double shots of Jägermeister, at a large meal, and then left at approximately 11:30 p.m., proceeding to different bar, Praha, with friends and family. At Praha, she consumed two or three vodka and cranberry drinks, she ran into some more friends, and after approximately an hour, [she returned to Sallade's with a group

of people.] After she arrived back at Sallade's, at approximately 1:15 a.m., John Woody, Tyrone Woody, and Tom Shirey arrived together, and at approximately 2:15 a.m., "Cool," "Mac," and [Jack,] a/k/a "Mister," arrived together. Amanda Gould, who sometimes bartended at Sallade's, explained [Jack] was a regular customer, who people referred to as "Mister."

At approximately 2:30 a.m., [she] tried to get everyone to leave Sallade's since it was past closing time. A lot of people left; however, Amanda Gould, her mother, Cindy Gould, Jeffrey Lanious, John Woody, Tyrone Woody, Tom Shirey, Ashley Catalano, Chris McGinty, "Mac," "Cool," Amy Verri, and [Jack] remained at the bar. At this time, everyone was still having fun and drinking when, at approximately 4:30 a.m., a verbal altercation occurred between "Cool" and Tom Shirey. Suddenly, Mr. Shirey fell on his head, and John Woody punched "Cool," while "Mac" and [Jack] began physically fighting. The fight between "Mac" and [Jack] "broke up," but then John Woody and Amy Verri cornered [Jack] in a booth, struck him with an ashtray, and punched him. At this time, Chris McGinty, "Cool," and Tom Shirey were fighting with each other. Tyrone Woody was lying on the floor, having been "knocked out;" however, he suddenly got up and punched Amanda Gould in the face. Tyrone Woody then walked towards the front door, when Amanda Gould heard Ashley Catalano scream, "Oh, my God, he's got a gun." Amanda Gould turned and saw [Jack,] who had either left the bar and reentered or retreated to a hallway area, with a gun in his hand. Amanda Gould heard Ashley Catalano say, "Mister, you don't want to do this." [She then] saw [Jack] point the gun straight up in the air over his head, and Cindy Gould attempted to wrestle the gun from him. [Jack] punched Cindy Gould in the head several times, and [she] fell when someone else struck her. Amanda Gould observed as someone struck Ashley Catalano with a Gray Goose bottle, and as Amanda began to dial 911, she was shot through her elbow and into her side. [She] testified approximately a second passed from when she last saw [Jack] with the gun in his hand until she turned to dial 911 and was shot. [She] testified she definitely saw [Jack] with a gun in his hands as he stood in the hallway a second before she was shot, and she did not see anyone else with a gun that evening.

As Amanda Gould stood feeling like she was "on fire," she observed Ashley Catalano calling 911, Tyrone Woody, who also had been shot, on the floor screaming, Chris McGinty jumping up

and down on Tom Shirey, her mom on the floor, and John Woody running over to assist Tyrone Woody. She did not know where Amy Verri was at this point but she saw "Cool" and Chris McGinty, neither of whom had been standing by the hall, fleeing the bar. However, "Cool" and Chris McGinty came back into the bar after the police arrived.

After the police arrived, an officer asked the remaining group of people for the identity of the shooter, and Amanda Gould told [the officer] that it was "Mister." A few hours later, while she was the hospital, she again told the police "Mister" had shot her. Specifically, on September 8, 2007, a detective showed her a photo array, and she identified [Jack] as "Mister" and the shooter. Additionally, at the preliminary hearing on February 20, 2008, Amanda Gould testified [Jack] was the only person she observed with a gun in his hand a "split second before" she was shot.

Tyrone Woody testified he was very drunk on the night in question, but he remember[ed] being at the Praha and then later … Sallade's with a group of people, including John Woody and Tom Shirey. He remember[ed] sitting at the bar, drinking alcohol, and talking with Cindy Gould while at Sallade's. The next thing he remember[ed was] saying, "It hurts," and then seeing the wing of a helicopter. He has no memory of anything that occurred from when he was talking to Cindy Gould to when he was being life-flighted in the helicopter. While Tyrone Woody acknowledg[ed] he suffered gunshot wounds to his stomach, hand, and finger on the night in question, he has no memory of being shot or engaging in any physical fights while at Sallade's. [He] denied either he or any of his friends had a gun with them that evening.

John Woody confirmed that he, Tyrone Woody, and some friends arrived at Sallade's around 2:30 a.m. on the night in question, and he was "buzzed." He recollected Tom Shirey and another man exchanged words and punches, and then he started fighting with someone. He testified:

> I felt something hit in the back of the head. I remember thinking "pussy." I remember looking at my brother and someone hit him on the top of his head with something and it kind of gets blurry after that. Then I heard a gunshot and I see my brother fall. I went over to him and

- 3 -

I tried to pick him up and Amy was like "you can't pick him up, you have [to] put pressure." [He] said "it hurts and burns." My memory gets a little blurry, but the next thing I went out [of] the bar and there [were] cops everywhere. That's what I clearly remember.

Ashley Catalano testified [that] on the night in question, she was with her sister, Amanda Gould, and Cindy Gould at Sallade's around 8:00 p.m., they left Sallade's at around 11:00 p.m., they went to Praha, and they went back to Sallade's at around 1:00 a.m. [She] was neither drinking nor using drugs as she was the designated driver for the evening. [She] indicated that, after they returned to Sallade's, at some point, Tom Shirey became upset because the bartender would not serve him any more alcohol. Tom Shirey apparently knocked over a barstool; however, the Woody brothers believed "Cool" had hit Tom Shirey, resulting in men fighting. [She] recalled "little fights" occurring between different groups throughout the bar, and she attempted to leave the bar. As she made her way to the side exit, she saw Amanda and Cindy Gould standing near the door and [Jack] in the hallway with his hand in his jacket. She observed as [Jack] took his hand out of his jacket and pointed a gun in the air. [She] yelled "He has a gun," and then someone hit her in the abck of the head, resulting in her falling to the ground. She then heard the gunshot, stood back up, and noticed [Jack] was no longer in the hallway.

…

[Jack] took the stand in his own defense, and he admitted that, on the night in question, he was with "Cool" and "Mac," and they arrived at Sallade's at approximately 2:40 a.m. Approximately thirty minutes later, a fight broke out among the patrons, and eventually someone tried to push everyone out the side door. [Jack] testified as follows on direct examination regarding a gun:

[Jack]: [E]verybody was going out the door and Mr. Woody and Mac was [sic] in the hallway, which included myself. We was [sic] trying to leave and I see Mac pull out a handgun and Mr. Woody tried to grab it and take it from me. That's when I heard the shot fire and I dove in the corner for cover.

- 4 -

[Defense Counsel]: Let me stop you there. Where were you in relation [to] Mac and Mr. Woody?

[Jack]: Behind Mac.

[Defense Counsel]: Where was he?

[Jack]: Into the hallway.

[Defense Counsel]: Towards [the] outside entrance into the hallway?

[Jack]: Yes, sir.

[Defense Counsel]: Do you know what kind of weapon Mac pulled out?

[Jack]: Semi-automatic.

[Defense Counsel]: What color was it?

[Jack]: Black and chrome.

[Defense Counsel]: Did you see anybody else with a gun?

[Jack]: No, sir.

[Defense Counsel]: How many shots did you hear fired?

[Jack]: One.

[Defense Counsel]: Did you see Mac actually holding the gun?

[Jack]: Yes, sir.

[Defense Counsel]: And could you describe what Mr. Woody did in an attempt to go after the gun?

[Jack]: Yes, sir. He reached down and tried to grab it from him.

…

At the conclusion of all testimony, the jury convicted [Jack] of aggravated assault as to Tyrone Woody and Amanda Gould; the jury acquitted [Jack] on two counts of attempted homicide. On April 19, 2010, the trial court imposed an aggregate sentence of 16.6 years to 33.3 years in prison, and [Jack] filed a timely counseled post-sentence motion, which the trial court denied.

**Commonwealth v. Jack**, No. 1261 WDA 2010, at 2-16 (Pa. Super., filed 11/27/12) (unpublished memorandum) (citations omitted).

This Court affirmed Jack's judgment of sentence, and the Supreme Court of Pennsylvania denied his petition for allowance of appeal. Jack filed a timely, *pro se* PCRA petition. After the PCRA court appointed counsel to represent Jack, counsel filed an amended PCRA petition as well as an addendum. The PCRA court held a hearing on Jack's amended petition before ultimately denying it. This timely appeal followed.

On appeal, Jack raises eight issues for our review. The first six issues concern Jack's allegations of trial counsel ineffectiveness, the seventh concerns the effectiveness of his appellate counsel, and the eighth and final issue asserts that the combined instances of ineffective assistance of counsel rendered the trial and subsequent appeal unreliable. We therefore begin our analysis with the applicable standards of review.

"On appeal from the denial of PCRA relief, our standard and scope of review is limited to determining whether the PCRA court's findings are supported by the record and without legal error." **Commonwealth v. Edmiston**, 65 A.3d 339, 345 (Pa. 2013) (citation omitted), *cert. denied*, **Edmiston v. Pennsylvania**, 134 S. Ct. 639 (2013). "[Our] scope of review

is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." ***Commonwealth v. Koehler***, 36 A.3d 121, 131 (Pa. 2012) (citation omitted).

"[T]his Court applies a *de novo* standard of review to the PCRA court's legal conclusions." ***Commonwealth v. Spotz***, 18 A.3d 244, 259 (Pa. 2011) (citation omitted). In order to be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence arose from one or more of the errors listed at 42 Pa.C.S.A. § 9543(a)(2).

It is well settled that

> [t]o plead and prove ineffective assistance of counsel a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act.

***Commonwealth v. Rykard***, 55 A.3d 1177, 1189-1190 (Pa. Super. 2012) (citation omitted). "Arguable merit exists when the factual statements are accurate and could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination." ***Commonwealth v. Barnett***, 121 A.3d 534, 540 (Pa. Super. 2015) (citation omitted). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests."

*Commonwealth v. Colavita*, 993 A.2d 874, 887 (Pa. 2010) (citation omitted). A failure to satisfy any prong of the test will require rejection of the claim. *See Spotz*, 84 A.3d at 311.

In his first issue on appeal, Jack contends that trial counsel was ineffective in failing to more fully pursue a theory that the Commonwealth's witnesses had conformed their testimony after speaking to each other. Jack concedes that trial counsel pursued this strategy. *See* Appellant's Brief, at 14. In his collateral attack, however, he argues that trial counsel could have done more to support this theory.

First, he contends that trial counsel could have cross-examined Jeff Lanious and John Woody to establish that their trial testimony differed from their original statements to the police. At trial, both men testified that they did not see anybody with a gun, let alone firing one, on the night of the melee. *See* N.T., Trial, 1/21/10, at 220; 1/22/10, at 360. However, in their initial statements to police after the incident, both men stated that they had seen Jack with a gun that night, and Lanious stated that he saw Jack firing the weapon.

Jack contends that this shift in testimony was indicative of these two witnesses conforming their testimony: "Amanda Gould believed she saw [Jack] with a gun and soon everyone in the bar adopted that story as their own." Appellant's Brief, at 16. At the PCRA hearing, trial counsel testified that he felt that cross-examining these witnesses on their previous

statements would have been detrimental to Jack's case. Trial counsel felt that any benefit to the strategy of demonstrating conformed testimony was outweighed by the danger of exposing the jury to indications that these two men had initially positively identified Jack as the shooter. *See* N.T., PCRA Hearing, 4/13-14/15, at 15.

Jack argues that trial counsel's purported strategy is belied by the fact that Lanious's prior statement was eventually published to the jury without any objection. However, as the Commonwealth correctly notes, trial counsel did object to the introduction of Lanious's prior statement, but the objection was overruled. *See* N.T., Trial, 1/22/10, at 379.

Despite skillful arguments, Jack has not established that trial counsel's chosen strategy was unreasonable. Part of the skillset of an effective trial attorney is knowledge of a particular jury and an ability to gauge how evidence will affect that jury. Here, while Jack has presented a plausible strategy that trial counsel could have pursued, he has not established that the strategy chosen by trial counsel was unreasonable. Thus, this argument fails.

In a related argument, Jack contends that trial counsel was ineffective for failing to reiterate Tyrone Woody's testimony that his only knowledge of the melee and its immediate aftermath comes from what others have told him. However, Jack's minimal argument on this point fails to establish why such reiteration was necessary. In closing arguments, trial counsel

highlighted the argument that the Commonwealth's witnesses had conformed their testimony. It is unclear what benefit reiterating one witness's unchallenged testimony would have provided Jack. This argument thus provides Jack no relief.

In his second issue on appeal, Jack argues that trial counsel was ineffective for failing to more rigorously pursue a strategy of demonstrating that the police had rushed to judgment in naming Jack the primary suspect in the shooting. In particular, Jack contends that trial counsel should have more vigorously cross-examined Detective Scott Sherer regarding his testimony that "three" or "several" eyewitnesses had claimed that they saw Jack with a gun in his hand immediately prior to the shooting.

Jack concedes that during the course of the investigation multiple witnesses provided such statements. He argues that all but one of these statements were made only after the investigators had already determined Jack to be the prime suspect, and that this fact should have been highlighted by trial counsel. However, even assuming that this underlying claim has arguable merit, we conclude that Jack has not established arguable merit in his contention that trial counsel failed to rigorously pursue this defense theory.

Jack concedes that trial counsel presented the theory that the police rushed to judgment in this investigation. Trial counsel presented evidence that at the time Jack was charged, only one witness placed the gun in his

hands – Amanda Gould. *See* N.T., Trial, 1/25/10, at 504-505. Furthermore, trial counsel elicited evidence that the detective that had filed charges against Jack was unaware that Amy Verri had identified "Mac" as the shooter when the detective filed the charges. *See id*. However, Detective Scherer, the detective highlighted in Jack's argument, was not responsible for the filing of charges against Jack. Detective Kenneth Ruckel filed the criminal complaint. *See* Criminal Complaint, 9/8/07.

Under these circumstances, we conclude that Jack cannot establish that there was any benefit to pursuing the issue of what evidence was available to Detective Scherer at the time that Detective Ruckel filed the charges. Furthermore, Detective Scherer's confusion over the timeline of the investigation was evident from his testimony. Trial counsel opined that, in his opinion, Detective Scherer had lost all credibility with the jury. *See* N.T., PCRA Hearing, 4/13-14/15, at 27. Rather than pursuing this line of defense with a witness who had no direct knowledge of the reasons for filing charges against Jack, was confused about the timeline involved, and possibly discredited due to his confusion, trial counsel focused on establishing the defense by questioning the detective who had filed the charges, and provided clear, consistent answers to his questions regarding the timeline. Thus, Jack has failed to establish arguable merit for his contention that trial counsel should have cross-examined Detective Scherer further about the timeline of the investigation.

In his third issue, Jack argues that trial counsel was ineffective for failing to object when the assistant district attorney referenced arrest "warrants" for Jack while questioning a police officer. Jack contends that the pluralization implied participation in prior criminal activity unrelated to the instant case. While possibly inappropriate,[1] there is no evidence that the prosecutor's action was intentional. Furthermore, this reference was a singular, passing statement on a prefatory matter. Trial counsel indicated that he had not even been aware that the prosecutor had pluralized "warrants" at the time. *See id*., at 18. It is thus unclear whether the jury noticed this statement. As such, it is also unclear that the jury made the unsupported inference of further criminal activity that Jack contends it did. We therefore conclude that Jack has failed to establish that he suffered any prejudice from trial counsel's failure to object to the prosecutor's question.

Next, Jack asserts that trial counsel was ineffective for failing to object to nine questions propounded by the Commonwealth to Detective Scherer. Jack had Detective Scherer read Amy Verri's pre-trial statement into evidence as a prior inconsistent statement. After trial counsel rested, the Commonwealth asked nine questions of Detective Scherer. First, he was

_____

[1] At a hearing outside of the jury's presence, the Commonwealth presented evidence that there was a Pennsylvania warrant and an Ohio warrant, presumably both related to the instant case. Thus, while there were technically two active warrants for Jack's arrest, it was arguably misleading to indicate that Jack was the subject of multiple arrest warrants.

asked whether Verri was "shaken" when she gave the statement, to which he replied affirmatively. The remaining questioning proceeded to clarify Detective Scherer's understanding of the statement.

Q      She didn't know who was who that night?

A      That's correct.

Q      She just said two individuals who she met at the bar were in the hallway when the shot was fired?

A      That's correct.

Q      She doesn't know which one was which?

A      That's correct.

Q      She couldn't put a name to either one of them?

A      That's correct.

Q      Where did she get the names that night?

A      I just assumed from conversing with the other bar patrons.

Q      You put the names "Mac," "Mister," and "Tony" in quotes, why did you do that?

A      Because those were her exact words. You have to understand, a report is taken on the scene and it is confusing for us also to separate people and people we interview. We take notes of the interview and then turn it into a report form as quickly as we can. There can be discrepancies in the report just as perception is. This is the way she described it and I perceive it can be different. We try to keep it as accurate as we can with specifics especially with dates and times and [that] kind of thing. But all we do is document exactly what she told us as best we can so that it can refresh my recollection when the

> case comes to trial and also to refresh her recollection from three years ago.
>
> Q    And Ms. Verri was unsure what individual had what and who had been associated with how at the time she gave the statement, correct?
>
> A    That's correct.

N.T., Trial, 1/26/10, at 565-567.

Jack does not provide authority for his contention that this questioning was improper other than the requirement that a non-expert witness have personal knowledge of the subject of their testimony. *See* Pa.R.E. 602. Jack contends that the questioning called for Detective Scherer to opine on Verri's state of mind at the time of her statement. Even assuming that the questioning was objectionable on this ground, Jack still must establish that trial counsel did not have a reasonable strategy behind his decision not to object.

When questioned on why he did not object to this testimony, trial counsel provided a detailed explanation.

> Q    Did you – having read that cross-examination, was there any element of that that you would in retrospect object to?
>
> A    No. He was just being asked as to how the statement was prepared.
>
> Q    Well, I think to be fair, his commentary went way beyond the factual observations. Do you have a recollection of that?
>
> A    Well, again, sitting in the courtroom observing the jurors, by this point half of the jurors were covering their mouths because they were smiling or covering muffled laughter

every time that particular detective would testify. He had lost all credibility with the jury. I was standing down at the end of the jury box when he was testifying and I could see all the jurors, and, as I said, they were frequently laughing and smiling at his response.

Q     Okay.

A     So in my opinion there was no point in not letting him testify. The more I can get the jury to laugh at him the better it is for me I figured.

Jack has not established that trial counsel's observations of the jury were false, nor has he established that given these observations, trial counsel's strategy was unreasonable. Jack's fourth issue on appeal therefore merits no relief.

Next, Jack contends that trial counsel was ineffective for failing to continue to object to statements that Jack was the "shooter." Jack contends that while eyewitnesses testified that they had seen Jack with a gun, none testified that they had actually seen him firing it. As result, Jack argues, any question or argument that characterized a witness's testimony as identifying Jack as the "shooter" was improper. Trial counsel apparently agreed, as he lodged an objection to the characterization after the first instance of such a characterization. **See** N.T., Trial, 1/25/10, at 436-437. As Jack now concedes, the trial court overruled the objection, noting that the inference was permissible due to the wounds suffered by the victims. **See id**., at 437.

Jack persuasively argues that the trial court's ruling was in error, as there was evidence that more than one gun might have been involved. In

other words, trial counsel argued that it was possible, based upon the evidence at trial, for the jury to find that he had possessed the gun during the melee, but that he had not fired it. However, as Jack clearly recognizes, allegations of trial court error cannot be litigated under the PCRA. *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 780 (Pa. Super. 2015) (*en banc*).

Jack thus raises this claim in the context of trial counsel's failure to continue to object to this characterization after his initial objection was overruled. However, Jack does not provide any evidence to establish that subsequent objections would have changed the trial court's mind. He therefore has failed to establish prejudice for this claim. *See Commonwealth v. Rovinski*, 704 A.2d 1068, 1072 (Pa. Super. 1997).[2]

In his sixth issue on appeal, Jack argues that trial counsel was ineffective for failing to object to testimony from police witnesses relating out-of-court statements made by eyewitnesses to the melee. This argument is closely related to Jack's fifth issue, in that he once again complains that these officers characterized the eyewitness statements as identifying him as

_____

[2] Jack also argues in his brief that appellate counsel was ineffective for failing to pursue this claim of trial court error on direct appeal. This claim is waived as it was not present in his amended PCRA petition or addendum, and therefore was not before the PCRA court. *See* Pa.R.A.P. 302(a). Furthermore, this claim is not contained within Jack's Rule 1925(b) statement of matters complained of on appeal.

the "shooter," despite the absence of such identification in the eyewitnesses' testimony.

As noted above, one of Jack's defense theories at trial was that the police had rushed to judgment in charging him. Thus, the officers' state of mind during the investigation became a relevant issue at trial. As a result, the officers' testimony regarding out-of-court statements made by eyewitnesses became admissible evidence for the purpose of establishing the officers' state of mind. **See Commonwealth v. Jones**, 658 A.2d 746, 751 (Pa. 1995). Jack cannot establish arguable merit, and this claim fails.

Next, Jack contends that appellate counsel was ineffective in failing to raise a challenge to the sufficiency of the evidence supporting his conviction for prohibited possession of a firearm. Specifically, Jack contends that the evidence at trial was insufficient to support this conviction as the trial court never explicitly admitted the certified record of Jack's prior conviction for a felony.

As Jack concedes in his brief, the Commonwealth moved for the admission of the certified record of the felony conviction, and trial counsel did not object to its admission. **See** N.T., Trial, 1/25/10, at 520. Under these circumstances, the trial court's failure to explicitly admit the record into evidence is irrelevant; the evidence is to be treated as evidence of record and given full consideration. **See Commonwealth v. Diaz**, 659 A.2d 563, 568 n.17 (Pa. Super. 1995). Jack's argument therefore merits no relief.

Finally, Jack contends that the cumulative effect of all of the alleged errors by trial and appellate counsel were sufficient to render the truth determining process unreliable and suspect. Generally, "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011) (citation omitted). But "[w]hen the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Id*. (citations omitted). Here, we dismissed only two claims for lack of prejudice—the third and fifth issues. We see no danger of cumulative prejudice based on our findings of just these two issues.

In any event, while all parties involved concede that the melee that preceded the shooting was chaotic, and that many of the Commonwealth's witnesses were under the influence of alcohol or other drugs, there was no dispute that Jack was present. Furthermore, the witness whose account of the shooting was most consistent from that night until trial placed a gun in Jack's hands moments before shots were fired. Clearly, the jury credited this witnesses' testimony, and Jack has provided nothing to establish that the jury's credibility determination was improperly influenced. Thus, even assuming for the sake of argument the proposition that the aggregate of prejudice flowing all of Jack's contentions was significantly greater than the prejudice from any single contention, we cannot conclude that the verdict was unreliable as a matter of law.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/21/2016